STATE OF NORTH CAROLINA v. DANNY DEAN FROGGE

No. 413A95-3

(Filed 4 February 2005)

**Constitutional Law— effective assistance of counsel—strategic decision after sufficient investigation**

The trial court erred in a first-degree murder case by determining that defendant did not receive effective assistance of counsel at his second capital sentencing proceeding based on the fact that defense counsel decided not to pursue evidence of defendant's organic brain damage through neurological testing but instead pursued a defense predicated on other grounds, and defendant's death sentence is reinstated, because: (1) defense counsel cannot be said to have acquired only rudimentary knowledge of defendant's history from a narrow set of sources when defense counsel interviewed defendant and his siblings and obtained defendant's school records, hospital records, correctional systems records, and psychological reports; (2) defense counsel had the benefit of watching the first trial unfold and seeing what worked and what did not, specifically noting that a defense which took defendant's head injury into account had been unsuccessful; and (3) defense counsel fully investigated defendant's social and medical history and provided that information to two experts, neither expert indicated to counsel a necessity for neurological testing, and counsel reasonably relied on their experts as they made the difficult but necessary choices as to which theory of defense to pursue.

Justice NEWBY did not participate in the consideration or decision of this case.

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review an order entered 29 October 2003 by Judge Lindsay R. Davis, Jr. in Superior Court, Forsyth County, granting defendant's motion for appropriate relief with regard to one claim of ineffective assistance of counsel. Heard in the Supreme Court 13 September 2004.

**STATE v. FROGGE**

[359 N.C. 228 (2005)]

*Roy Cooper, Attorney General, by Valárie B. Spalding, Special Deputy Attorney General, for the State-appellant.*

*Garland B. Baker and Don Willey for defendant-appellee.*

*William L. Osteen, Jr. for the North Carolina Academy of Trial Lawyers, amicus curiae.*

*Charles G. Monnett III and Associates, by Charles G. Monnett III, and Jeffrey B. Welty for the Brain Injury Association of North Carolina, amicus curiae.*

EDMUNDS, Justice.

In this case, we review the trial court's determination that defendant did not receive effective assistance of counsel at his second capital sentencing proceeding. Because we find that defendant's trial counsel provided adequate assistance under the applicable standards established by the United States Supreme Court, we reverse the trial court and order the reinstatement of defendant's death sentence.

Defendant Danny Dean Frogge was tried twice for the murders of his father and stepmother. At the first trial, evidence was presented indicating that defendant was living with his father and his bedridden stepmother. On the night of 4 November 1994, defendant stabbed his father approximately ten times, then moved to his stepmother's bed and stabbed her approximately eleven times. Defendant was convicted of two counts of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. Details of the offenses are set out in *State v. Frogge,* 345 N.C. 614, 481 S.E.2d 278 (1997) *(Frogge I).*

At the sentencing proceeding in *Frogge I,* defendant testified that he had been drinking heavily the night of the killings. He claimed that he knifed his father only after his father hit him with an iron bar. He further testified that he must have stabbed his stepmother but had no recollection of doing so. The sentencing jury found two statutory mitigating circumstances: that defendant was under the influence of a mental or emotional disturbance at the time of the offense, N.C.G.S. § 15A-2000(f)(2) (2003); and that defendant suffered from an impaired capacity to conform his conduct to the requirements of the law, N.C.G.S. § 15A-2000(f)(6). The jury recommended a sentence of life imprisonment for the murder of defendant's father and a sentence of death for the murder of defendant's stepmother.

This Court reversed defendant's conviction because inadmissible hearsay had been introduced at the trial. *Frogge I*, 345 N.C. 614, 481 S.E.2d 278. Prior to the retrial, defendant additionally was indicted for robbery with a dangerous weapon based on allegations that he had stolen his father's wallet the night of the murders. Upon retrial, defendant again was convicted of two counts of first-degree murder. He was also convicted of robbery with a dangerous weapon. Because defendant had been sentenced to life imprisonment at the first trial for the murder of his father, the State sought the death penalty only for the murder of defendant's stepmother. The jury at the retrial found four aggravating circumstances, no statutory mitigating circumstances, and six out of ten submitted nonstatutory mitigating circumstances. The jury recommended a sentence of death for the murder of defendant's stepmother, and the trial court entered judgment accordingly. Defendant appealed, and this Court found no error. *State v. Frogge*, 351 N.C. 576, 528 S.E.2d 893 (2000) (*Frogge II*). The United States Supreme Court denied defendant's petition for writ of certiorari. *Frogge v. North Carolina*, 531 U.S. 994, 148 L. Ed. 2d 459 (2000).

Defendant thereafter filed a motion for appropriate relief (MAR). The trial court denied several of defendant's claims and, on 2 August 2002, conducted an evidentiary hearing on the remainder. On 29 October 2003, the trial court entered an order denying defendant's remaining claims, except one. As to that claim, the trial court determined that defendant had not received effective assistance of counsel pursuant to *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984), and ordered a new sentencing hearing. On 1 April 2004, this Court allowed the State's petition for writ of certiorari to review the order of the trial court.

The record reveals that defendant was represented by lead counsel Danny Ferguson and associate counsel David Freedman at both *Frogge I* and *Frogge II*. Before the trial of *Frogge I*, they engaged investigator Homer Young. In preparing for that trial, investigator Young interviewed defendant's family members and submitted reports of those interviews to defense counsel. These reports included information that in April 1990 defendant had been beaten and suffered a significant head injury. At defendant's first sentencing proceeding, his sisters testified to changes they observed in defendant's personality after the beating.

Defense counsel retained Dr. Gary Hoover, a clinical psychologist, as an expert witness for *Frogge I*. During the sentencing pro-

ceeding, Dr. Hoover testified that he received training through the Reitan Neuropsychological Laboratory pertaining to neuropsychological assessment and thus possessed the "background and training that has to do with the diagnosis of brain behavior relationships vis-a-vis head injuries." However, Dr. Hoover also acknowledged that he was neither a neurologist nor a medical doctor and was not qualified to conduct a neurological assessment. Although Dr. Hoover had conducted neuropsychological evaluations on patients referred to him by psychologists and neurologists for assessment of head injuries, he did not conduct neurological or neuropsychological testing on defendant. Instead, Dr. Hoover carried out a forensic psychological evaluation in which he reviewed defendant's psychological records that resulted from his incarceration for murder in the 1980s; interviewed defendant in person three times over a period of several months; reviewed defendant's school records, hospital records, and correctional system records; reviewed the investigative reports of the instant murders prepared by police and by investigator Young; and interviewed defendant's family members, friends, and acquaintances.

Dr. Hoover's forensic evaluation also included consideration of Bowman Gray/Baptist Hospital Medical Center's records of defendant's 1990 treatment for his head injury. These records stated that defendant suffered from postconcussive disorder. Relying in part on the known correlation between residual behavior difficulties and head injuries, Dr. Hoover testified that while defendant presented no current evidence of a head injury, the 1990 trauma left defendant with residual mood difficulties. The injury also affected defendant's cognitive functions and intellectual skills to the extent that, over time, he suffered episodic seizures, slurred speech, disorientation, increased irritability, episodes of paranoia, and an increasingly withdrawn personality. In Dr. Hoover's expert opinion, defendant suffered from "[d]elirium due to multiple etiologies, substance intoxication delirium, alcohol and mood disorder due to postconcussive disorder." Specifically, Dr. Hoover was of the belief that the combination of defendant's heavy consumption of alcohol on the day of the murders and the mood disorder resulting from defendant's 1990 head injury "were responsible for the explosion into a rage that occurred when [defendant] was provoked by his father."

The prosecutor cross-examined Dr. Hoover vigorously as to the validity of his opinion that defendant was suffering from delirium when he killed his father and stepmother. Thereafter, the

State presented Stephen I. Kramer, M.D., a neuropsychiatrist, as a rebuttal expert. Dr. Kramer reviewed Dr. Hoover's preliminary forensic psychological examination of defendant, defendant's Department of Correction records, a State Bureau of Investigation report on the crime scene, medical records related to defendant's 1990 head injury, and the results of a 1990 CAT scan of defendant's brain; however, he did not interview defendant or his family before testifying.

Dr. Kramer was critical of Dr. Hoover's analysis of defendant's condition. He testified that Dr. Hoover's report contained no data to support Dr. Hoover's conclusions and that the evidence "argued against" defendant's being delirious at the time of the murders. In Dr. Kramer's expert opinion, Dr. Hoover "violated the rules of using the [Diagnostic and Statistical Manual of Mental Disorders] to make a psychiatric diagnosis and also misapplied the criteria sets of the individual disorders listed." According to Dr. Kramer, defendant's 1990 head injury could be characterized as "mild to moderate," and defendant's prognosis was good upon his release from the hospital after treatment for that injury. Therefore, Dr. Kramer would expect defendant to have recovered fully from his head injury after discharge.

During the State's redirect examination of Dr. Kramer, he was asked about Dr. Hoover's forensic psychological evaluation of defendant. The following exchange then occurred:

Q. And are you aware of any data reviewed by Dr. Hoover or yourself that would suggest that residual symptoms of a head injury were involved in the stabbings on November 4th or 5th?

A. I've seen none.

Q. And would you form any or ask any psychological testing to be conducted to determine whether or not a head injury would be a contributing factor?

A. Well, it can be done, yes.

Q. And was it done in this case?

A. No, it was not.

Q. Are you aware of any justification for that not being done?

A. None whatsoever.

Q.  And is that the kind of thing you would expect to be done in a forensic evaluation?

A.  That's correct.

As noted above, in *Frogge I* this Court reversed defendant's conviction. On retrial in *Frogge II*, defendant again was convicted of two counts of first-degree murder and a new capital sentencing proceeding was conducted for the murder of defendant's stepmother. Defendant's sisters recounted the testimony they had given at the first trial as to the nature, severity, and aftermath of defendant's 1990 head injury. Although these family members were not presented as experts, one of defendant's sisters was a nurse. She advised the jury that defendant suffered a blood clot on his brain due to the head injury. She added that during his resulting hospitalization, defendant had to be restrained, did not know who or where he was, and could barely recognize members of his family. In addition, she testified that defendant suffered permanent effects from the head injury, such as aphasia, diminished memory, and signs of paranoia. Although defendant recovered somewhat, his behavior changed and he seemed withdrawn and paranoid.

In preparation for the trial of *Frogge II*, defense counsel replaced Dr. Hoover with Dr. William Tyson as defendant's expert psychologist. Dr. Tyson testified that at the time of the homicides, defendant suffered from a "personality disorder . . . defined as a pervasive limitation to adult functioning that had been aggravated by long term substance abuse and dependence." As a result of this condition, "it was most likely [defendant] would have been acting on impulse with limited ability to reason."

Although the two statutory mitigating circumstances found by the jury in *Frogge I* were submitted to the sentencing jury in the *Frogge II* trial, the *Frogge II* jury did not find either one. The catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9) (2003), was also submitted but not found. However, the *Frogge II* jury found six out of ten submitted nonstatutory mitigating circumstances. That jury also found four aggravating circumstances: that defendant had previously been convicted of a violent felony, N.C.G.S. § 15A-2000(e)(3) (2003); that the murder was committed during the course of an armed robbery, *id.* § 15A-2000(e)(5) (2003); that the murder was "especially heinous, atrocious, or cruel," *id.* § 15A-2000(e)(9) (2003); and that the murder was part of a course of conduct in which defendant engaged and which included the commission by

defendant of other crimes of violence against another person or persons, *id.* § 15A-2000(e)(11) (2003). Finding that the mitigating circumstances did not outweigh the aggravating circumstances, the jury recommended a sentence of death.

New counsel were appointed to represent defendant for his post-conviction proceedings. Defendant filed a MAR with the trial court in which he alleged, among other things, ineffective assistance of trial counsel (IAC). Specifically, he contended that trial counsel failed to investigate and offer evidence that, at the time of the murders, defendant was suffering permanent residual effects of his 1990 head injury. Defendant claimed that if trial counsel had arranged for neurological testing to determine the extent of damage resulting from his 1990 injury, they would have been led to a qualified expert who could testify that defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired as a result of defendant's head injury and his consumption of alcohol. Defendant argued that if such mitigating evidence had been pursued, there was a reasonable probability that the jury would have returned a different sentencing recommendation.

The trial court conducted an evidentiary hearing as to the issue of ineffective assistance of counsel. Defendant presented two experts to support his claim. The first was Dr. Claudia Coleman, who testified that she had earned both a Master's Degree and a Ph.D. from the University of Mississippi in clinical psychology. After detailing her career as a practitioner and a teacher, Dr. Coleman was accepted by the trial court as an expert in the fields of forensic psychology and neuropsychology. Dr. Coleman testified that she had reviewed a pre-sentence diagnostic report prepared prior to defendant's sentencing in 1985 for second-degree murder, affidavits prepared by members of defendant's family, and the testimony of Drs. Hoover and Tyson. She also had met with defendant and administered such tests as the Wechsler Adult Intelligence Scale, the Wisconsin Card Sort Test, and the Stroop Color and Word Test. These tests measured defendant's various mental and intellectual qualities, including memory function, new learning, visual skills, verbal fluency, and brain trauma. She diagnosed defendant as having a cognitive disorder, not otherwise specified, that had existed since eighteen to twenty-four months after his 1990 head injury. She also separately diagnosed defendant as suffering from a personality change combining both paranoid and aggressive features, resulting from his head injury, and also as exhibiting polysubstance dependence. Dr. Coleman testified that the diagnosis

of a cognitive disorder could be substantiated through neuropsychological testing, but she was unable to predict whether the type of brain impairment she observed in defendant would be reflected in an MRI scan. In Dr. Coleman's expert opinion, defendant suffered from a diminished mental capacity such that he could not fully weigh and understand the consequences of his actions at the time he killed his father and stepmother. She also was of the opinion that defendant committed the murders while under the influence of an emotional or mental disturbance.

Defendant's second MAR expert was Dr. Thomas Hyde. Dr. Hyde had completed a joint M.D./Ph.D. program at the University of Pennsylvania. His Ph.D. was awarded in anatomy with a specialty in neuroscience. At the time of the hearing, he was board certified in general neurology and was both teaching and practicing behavioral neurology. He was accepted by the trial court as an expert in the fields of general medicine, neurology, and behavioral neurology. Before the hearing, Dr. Hyde interviewed and examined defendant. He also reviewed Dr. Coleman's report, some affidavits, records from defendant's 1990 hospitalization, and a portion of the transcript of *Frogge I*. He conceded that he had not reviewed the testimony of Dr. Hoover and had given only cursory review to the testimony of Drs. Tyson and Kramer.

Dr. Hyde was of the opinion that defendant had organic or structural brain damage that most likely resulted from his 1990 head injury. Although an MRI scan of defendant conducted on 11 February 2002 showed no anomalies, Dr. Hyde testified that many neurological disorders are not reflected on such scans and that brain damage can be diagnosed even when an MRI fails to reveal any abnormalities. When asked, Dr. Hyde recommended neuropsychological testing for any individual who has suffered a closed head injury. Ideally, this testing should be conducted by a neurologist, a neurosurgeon, a neuropsychologist, or a psychologist with training in traumatic brain injury. Dr. Hyde added that, speaking in general terms, defendant should have received such an examination. It was Dr. Hyde's professional opinion that, at the time of the 1994 murders, defendant suffered from a diminished mental capacity that prevented him from fully weighing and understanding the consequences of his actions. In addition, Dr. Hyde believed defendant was then under the influence of an emotional or mental disturbance.

Defendant's trial counsel also testified at the MAR hearing. Lead counsel Ferguson testified that he had tried approximately seven cap-

ital cases in Tennessee and acted as lead counsel on eight or nine capital cases in North Carolina. Associate defense counsel Freedman testified that he practices mainly criminal law and is a board certified specialist in that field.

Although the jury in *Frogge I* found the section 15A-2000 (f)(2) and (f)(6) mitigating circumstances, defense counsel testified that they had been dissatisfied with Dr. Hoover's performance in that trial. They perceived that he had fared poorly under the State's cross-examination, and attorney Freedman added, "I believe [Dr. Hoover] testified to some physiological damage, which was one of the reasons he was not found to be a credible witness." In addition, defense counsel felt that the testimony of the State's rebuttal expert had been damaging. According to attorney Freedman, "I felt that Doctor [K]ramer had better—had gotten the better of [Dr. Hoover] at the trial." As a result, defense counsel decided to retain Dr. Tyson as an expert psychologist for defendant's retrial. Attorney Freedman had worked with Dr. Tyson before defendant's retrial and held a favorable opinion of his abilities.

Attorney Freedman testified that

I knew one of the reasons Doctor [K]ramer had gotten the better of [Dr. Hoover] was because [K]ramer had reviewed . . . the State's file; so I wanted to try and short-circuit that, and I provided everything I could to Doctor Tyson so he could review everything and be prepared on that.

Accordingly, while preparing for defendant's second trial, defense counsel provided Dr. Tyson with their entire discovery file; advised him as to defendant's head injury, the resulting perceived changes in his personality, and the significance that family members placed on the injury; and made available to him defendant's medical records. The material supplied to Dr. Tyson also included the testimony given at *Frogge I* by Drs. Hoover and Kramer, and attorney Freedman believed that Dr. Tyson testified in *Frogge II* that he had reviewed this testimony. Even possessing this information, Dr. Tyson advised attorney Ferguson that he would not change his diagnosis.

In deciding prior to the trial of *Frogge II* whether to pursue evidence of defendant's head injury as potentially mitigating evidence, defense counsel testified that they depended on Dr. Tyson's expertise. Although attorney Ferguson acknowledged during the MAR hearing that he knew Dr. Tyson was not a neurologist or neuropsychologist and could not render neurological opinions, he added, "I think he had

the ability to tell me that if it was significant where we should go next. And he didn't indicate that there was any significance, that [the head injury] was significant. So, I relied on what he said." When cross-examined, attorney Ferguson reaffirmed that he depended on Dr. Tyson's informed opinion:

Q. Now, I think you made it clear this morning, I just want to be sure, that you advised Doctor Tyson, or discussed with him more than once, the concerns of the family members about the personality changes they observed in the Defendant after the beating in 1990, is that correct?

A. Yes.

Q. And you asked him whether that was significant, in his opinion?

A. Yes.

Q. And he was firm on saying no, it would not change my diagnosis, was he not?

A. Yes.

Q. And you felt entitled to rely on the superior knowledge of an expert?

A. That's correct.

Attorney Ferguson reemphasized the point during a similar exchange later in the hearing:

Q. Doctor Tyson did not specifically focus on the head injury, did he?

A. No, and as I've said earlier, he was told about it, provided the information, and did not deem it significant.

Q. Yes, sir. And yet he made that decision without [the] benefit of any type of neurological or neuropsychological testing?

A. Yes, sir, I assume that he had the—at least the qualifications to make that decision, whether neurological testing might be needed; and he was much more qualified to make that decision than I was, and [w]e relied on his opinion.

All this testimony indicates that defense counsel relied both on Dr. Tyson's diagnosis of defendant's condition and on his informed opinion that additional testing or experts were not needed.

The trial court considered the evidence presented at the MAR hearing and also reviewed the evidence presented at both trials, including the sentencing proceedings. It then applied the two-part test set out by the United States Supreme Court in *Strickland v. Washington* to determine whether trial counsel had provided effective assistance to defendant. 466 U.S. 668, 80 L. Ed. 2d 674 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 80 L. Ed. 2d at 693. This Court adopted the *Strickland* test in *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985).

The United States Supreme Court considered *Strickland* in the context of counsel's responsibility to investigate and present mitigating evidence at a capital sentencing proceeding in *Wiggins v. Smith*, 539 U.S. 510, 156 L. Ed. 2d 471 (2003). In *Wiggins*, defense counsel elected to follow a strategy of continuing to deny the defendant's direct involvement in the murder in lieu of a strategy based on mitigation. Before making this decision, counsel obtained from a psychologist a report that revealed the defendant's IQ, his difficulty in coping with difficult situations, and that he "exhibited features of a personality disorder." *Id.* at 523, 156 L. Ed. 2d at 486. Defense counsel also obtained a copy of the defendant's presentence investigation report, which included a single page describing the defendant's personal history. This page spoke of the defendant's "misery as a youth" and the time he spent in foster care. *Id.* Finally, defense counsel had a copy of records maintained by the Baltimore City Department of Social Services (DSS) documenting the defendant's placements by that organization. *Id.*

The Supreme Court determined that the decision by Wiggins' counsel not to expand their investigation beyond these records failed to meet either the professional standards prevailing in Maryland at that time or the standards for capital defense work set out by the American Bar Association. *Id.* at 524-25, 156 L. Ed. 2d at 486. However, the Court took pains to point out that it was not second-guessing counsel's decision to pursue one strategy over another.

"[O]ur principal concern in deciding whether [defense counsel] exercised 'reasonable professional judgmen[t]' is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable.*" *Id.* at 522-23, 156 L. Ed. 2d at 485-86 (citation omitted). The Supreme Court then observed that "counsel abandoned their investigation of [the defendant's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources," *id.* at 524, 156 L. Ed. 2d at 487; that counsel's investigation failed to pursue information contained in the DSS report, even though nothing in that material suggested that a mitigation case would be counterproductive or that additional investigation would be useless, *id.* at 525, 156 L. Ed. 2d at 487; that counsel's focus on the strategy of contesting responsibility made them inattentive to other potential mitigating evidence, *id.* at 526, 156 L. Ed. 2d at 487; and that counsel ultimately did not follow their own announced strategy of focusing exclusively on the defendant's direct responsibility, *id.* at 526, 156 L. Ed. 2d at 488. Accordingly, the Supreme Court held that defense counsel "abandon[ed] their investigation [of a possible mitigation strategy] at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28, 156 L. Ed. 2d at 489.

In the case at bar, after reviewing the evidence, the trial court found that

> [defense c]ounsel knew of Frogge's head injury, but did not investigate with the assistance of expert consultation the potential mitigation evidence of "organic brain damage" and its effects on his ability to control violent impulses. Counsel here had the "benefit" of Dr. [K]ramer's criticism of Dr. Hoo[v]er's testimony in the 1995 trial—the "roadmap" that post-conviction counsel now say was available. While true that the effects of Frogge's head injury include anti-social behavior that could be damaging to his case, trial counsel's failure to investigate was not influenced by that circumstance. Like trial counsel in <u>Wiggins</u>, Frogge's trial counsel turned their focus to other concerns, and were "inattentive" to the potential mitigating evidence arising out of the head injury. Frogge had the benefit of good lawyers with experience in capital cases, but <u>Wiggins</u> compels the conclusion that their failure to pursue the evidence of organic brain injury as has now been done in post-conviction proceedings was objectively unreasonable.

After determining that the performance of defendant's trial counsel was deficient, the trial court then turned to the question of whether defendant was prejudiced. The trial court noted that Dr. Hoover's opinion of defendant's mental state at the time of the murders included the effects of the 1990 head injury while Dr. Tyson's opinion did not, but concluded that the difference was insignificant because Dr. Hoover's direct and cross-examination testimony revealed that he "lacked the expertise and results of testing required to reach his conclusions." Accordingly, the trial court determined that "[t]he question is distilled . . . to whether the lack of expert testimony concerning the organic brain disorder in 1998 sufficiently undermines confidence that the jury would have reached the same result whether or not that evidence was presented." Concluding that, under the facts of this case, defendant had established that confidence in the fairness of the proceedings against him had been impaired, the trial court ordered a new sentencing proceeding.

When considering rulings on motions for appropriate relief, we review the trial court's order to determine "whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *State v. Stevens*, 305 N.C. 712, 720, 291 S.E.2d 585, 591 (1982). We begin with the trial court's finding that counsel's performance was deficient. We undertake this inquiry mindful of the admonitions in *Strickland* and *Wiggins* to review counsel's decisions in light of the information available to them at the time and not with the benefit of hindsight. *Wiggins*, 539 U.S. at 523, 156 L. Ed. 2d at 486; *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694. Accordingly, we observe that counsel had numerous pertinent factors to consider as they decided their strategy for defendant's second sentencing proceeding. First, defendant had committed a murder prior to suffering the head injury. Second, graphic lay evidence of defendant's 1990 head injury and its sequelae had been presented through his sisters and others close to him at the *Frogge I* trial and would be presented again. Third, at the *Frogge I* sentencing proceeding, Dr. Hoover had presented an expert psychological opinion that took into account both defendant's head injury and his background. The sentencing jury, having heard that evidence, returned a capital verdict. Fourth, Dr. Kramer criticized Dr. Hoover for failing to conduct additional psychological testing that might determine whether defendant's head injury was a contributing factor to the murders. However, Dr. Kramer went on to state that, in his opinion, the

**STATE v. FROGGE**

[359 N.C. 228 (2005)]

1990 injury was of mild to moderate severity and defendant's prognosis on discharge was good, implying that the additional psychological testing was unlikely to bear fruit. Dr. Kramer did not indicate that in preparation for trial defendant should have been tested for organic brain damage or neurological harm resulting from the 1990 head injury. Fifth, defense counsel were dissatisfied with Dr. Hoover's performance in *Frogge I* and replaced him with Dr. Tyson, who had been an effective witness in the past for attorney Freedman. When supplied with defendant's medical and social histories and with transcripts of the proceedings in *Frogge I*, Dr. Tyson stood by his opinion that defendant suffered from a personality disorder and, at the time of the murders, was acting on impulse with limited ability to reason. In this context, we must now decide whether, under *Wiggins*, the trial court properly concluded that defense counsel's decision not to pursue evidence of organic brain damage through neurological testing was objectively unreasonable and undermined confidence in the verdict.

The test in *Wiggins* is whether a strategic decision was made after sufficient investigation, not whether that decision was later proven to be correct. Unlike counsel in *Wiggins*, who abandoned the idea of pursuing a defense based on mitigation after reviewing only a psychological report, DSS records, and a presentence investigation report, defense counsel here interviewed defendant and his siblings and obtained defendant's school records, hospital records, correctional systems records, and psychological reports. Thus, defendant's counsel cannot be said to have "acquired only rudimentary knowledge of [defendant's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524, 156 L. Ed. 2d at 487. Defendant's attorneys also had the benefit of watching the first trial unfold and seeing what worked and what did not. Specifically, a defense which took defendant's head injury into account had been unsuccessful. By the time defense counsel were preparing for defendant's second trial, they had consulted two mental health experts, Drs. Hoover and Tyson, both of whom had full access to defendant, his family, and the pertinent medical records of defendant's head injury, and neither of whom recommended neurological testing.

In addition, defense counsel testified that they depended on Dr. Tyson to advise them whether or not additional testing of defendant was needed but that, after receiving all the information from the first trial, Dr. Tyson stuck by his original diagnosis of defendant. This testimony indicates that defense counsel were prepared to seek such

testing if they had adequate reason to believe it was necessary or would be useful.

Although we have found no cases from this Court with facts paralleling those presented here, cases from other jurisdictions consistently have found no ineffective assistance of counsel under analogous circumstances.[1] Beginning with cases from the United States Fourth Circuit, we see that in *Tucker v. Ozmint*, the defendant received the death penalty at his first trial. 350 F.3d 433 (4th Cir. 2003), *cert. denied*, —— U.S. ——, 158 L. Ed. 2d 715 (2004). Thereafter, the South Carolina Supreme Court reversed the defendant's sentence. At the resentencing hearing, the defendant's forensic psychologist testified that the defendant had been abused as a child and that while the defendant understood the requirements of the law, he was unable to conform his behavior to those standards. *Id.* at 437. In rebuttal, the South Carolina prosecutors presented three expert witnesses, including a forensic psychiatrist and a clinical psychologist. The State's experts testified that the defendant's expert's diagnosis constituted a mere description of behavior, not a mental disease or defect. *Id.* at 437-38.

The defendant again was sentenced to death. He thereafter claimed IAC during his capital sentencing proceeding on the basis that his trial counsel unreasonably limited their investigation into the defendant's childhood abuse and failed to provide corroborating records to his expert. After observing that the defendant's expert had prepared to testify by interviewing the defendant several times, by considering the deposition of the doctor who testified in the defendant's first trial, and by reviewing the social history of the defendant prepared by a licensed social worker, the Fourth Circuit held that

> [c]ounsel's performance in preparing Tucker's mitigation case far surpassed the inadequate performance described in *Wiggins*. Counsel attended the previous trial, made reasoned judgments about which witnesses to call, and presented an expert psychologist who gave the jury a full picture of Tucker's disturbing social history. "Although counsel should conduct a reasonable investigation into potential defenses, *Strickland* does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client."

---

1. While some of these cases predate *Wiggins*, we do not believe that the analysis and holding in *Wiggins* would dictate a different result.

*Id.* at 441-42 (quoting *Green v. French*, 143 F.3d 865, 892 (4th Cir. 1998), *cert. denied*, 525 U.S. 1090, 142 L. Ed. 2d 698 (1999), *abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362, 146 L. Ed. 2d 389 (2000)) (footnote omitted).

In *United States v. Roane*, the defendants were convicted of multiple murders arising out of their drug-trafficking operations. 378 F.3d 382 (4th Cir. 2004). Evidence indicated that the IQ of one of the defendants was barely sufficient to prevent him from being classified as ineligible for the death penalty because of mental retardation. That defendant claimed his defense counsel was ineffective for failing to assert that IQ-score inflation may have boosted his score artificially. However, the psychologist who conducted the test also stated that he understood the implications of his findings and therefore had double-checked the result and consulted with colleagues. *Id.* at 409. Although the opinion does not reflect whether the psychologist testified as a witness for the prosecution or for the defendant, the Fourth Circuit held that defense counsel "was presented with a mental health report, and he was under no mandate to second-guess that report." *Id.* at 409. In reviewing a separate IAC claim that did not involve expert testimony, that court considered the efforts defense counsel had made to investigate the defendant's potential alibi and, rejecting the claim, stated that relief is usually granted only when defense counsel "has failed to investigate a defense *at all* or has performed an investigation so minimal that no strategic reason could be given for the failure to investigate further." *Id.* at 411; *see also Byram v. Ozmint*, 339 F.3d 203, 210 (4th Cir. 2003) ("[A] failure to 'shop around' for a favorable expert opinion after an evaluation yields little in mitigating evidence does not constitute ineffective assistance.") (quoting *Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir.), *cert. denied*, 506 U.S. 958, 121 L. Ed. 2d 342 (1992)), *cert. denied*, 541 U.S. 947, 158 L. Ed. 2d 374 (2004); *Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir.) ("[C]ounsel had received [the mental health expert's] report concluding that [the defendant] was not mentally ill at the time of the offense. To be reasonably effective, counsel was not required to second-guess the contents of this report. . . . Counsel thus made a diligent effort to pursue promising lines of investigation, and [the defendant's] present attempt to challenge his counsel's decision not to investigate mental health issues more fully is 'a product of hindsight and fails to address the facts reasonably relied upon by counsel at the time.' ") (quoting *Roach v. Martin*, 757 F.2d 1463, 1478 (4th Cir.), *cert. denied*, 474 U.S. 865, 88 L. Ed. 2d 154 (1985)), *cert. denied*, 525 U.S. 1012, 142

L. Ed. 2d 441 (1998) (citations omitted); *Poyner*, 964 F.2d at 1419 ("The mere fact that [the defendant's] counsel did not shop around for a psychiatrist willing to testify to the presence of more elaborate or grave psychological disorders simply does not constitute ineffective assistance.").

A similar pattern is apparent in state cases. In *State v. Steckel*, the defendant was convicted of murder when the victim died in a fire the defendant set in the victim's home after sexually assaulting her. 2001 Del. LEXIS 429 (Del. Super. Ct. Aug. 31, 2001) (No. 9409002147), *aff'd*, 795 A.2d 651 (Del. 2002). The defendant's trial counsel met with a psychiatrist before trial both to determine whether an insanity defense was possible and to assist in mitigation. After several consultations with the defendant, the psychiatrist was of the opinion that the defendant suffered from attention deficit hyperactivity disorder, substance abuse, and antisocial personality disorder. The expert further believed that none of these conditions constituted a legal defense. Before trial, defense counsel also consulted a neurologist to determine whether brain dysfunction could be used as a mitigating factor. During post-conviction proceedings in which the defendant alleged IAC, the defendant presented another expert who believed that the defendant's consistent exaggerations should have alerted defense counsel to the possibility that the defendant had a narcissistic personality disorder. The Delaware Superior Court denied relief, holding that "[c]ounsel is not required to continue to search for additional mental health professionals when it appears that the diagnosis given by those already retained would reasonably explain the conduct of the [d]efendant." *Id.* at *20.

In *State v. Hessler*, the defendant was convicted of six murders. 2002 Ohio LEXIS 3313 (Ohio Ct. App. June 27, 2002) (No. 01AP-1011), *appeal denied*, 97 Ohio St. 3d 1423, 777 N.E.2d 277 (2002). Defense counsel retained and used two expert clinical psychologists during the mitigation portion of the defendant's trial to testify about the defendant's mental illness and the effects of the inadequate treatment he had received at various mental health facilities. Later, during post-conviction proceedings, the defendant claimed that his trial counsel should have sought the services of an expert psychiatrist or an expert social worker. The Court of Appeals of Ohio denied relief, holding that " '[a] postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial.' " *Id.* at *35 (quoting *State v. Combs*, 100 Ohio App. 3d 90, 103, 652 N.E.2d 205, 213 (1994)); *see also Ringo v.*

*State,* 120 S.W.3d 743, 749 (Mo. 2003) ("Where trial counsel has . . . made reasonable efforts to investigate the mental status of defendant and has concluded that there is no basis in pursuing a particular line of defense, counsel should not be held ineffective for not shopping for another expert to testify in a particular way."); *Asay v. State,* 25 Fla. L. Weekly S523, ——, 769 So. 2d 974, 985-86 (2000) (trial counsel who conducts a reasonable pretrial investigation into mental health mitigation evidence is not incompetent where the defendant secures a more favorable mental health expert during post-conviction proceedings); *Henry v. State,* 28 Fla. L. Weekly S753, ——, 862 So. 2d 679, 686 (2003) (In finding no IAC, reviewing court considered defense counsel's decision not to pursue on retrial a strategy that failed at the first trial.).

Thus, where the record demonstrates (1) defense counsel fully investigated defendant's social and medical history and provided that information to Drs. Hoover and Tyson, (2) neither expert indicated to counsel a necessity for neurological testing, and (3) counsel relied on their experts as they made the difficult but necessary choices as to which theory of defense to pursue, we are unwilling to find that the decisions of defendant's attorneys constituted ineffective assistance of counsel or represented inattention to other possible defenses. Accordingly, we conclude that defense counsel did not prematurely abandon a defense based on organic brain damage and that their election to pursue a defense predicated on other grounds constituted a " 'reasonable professional judgment[].' " *Wiggins,* 539 U.S. at 533, 156 L. Ed. 2d at 492 (quoting *Strickland,* 466 U.S. at 691, 80 L. Ed. 2d at 695).

Because defense counsel's performance was not "objectively unreasonable" and was adequate under *Strickland* and *Wiggins,* we do not need to consider whether defendant suffered prejudice. Therefore, for the reasons stated above, the order of the trial court is reversed and defendant's death sentence is reinstated.

REVERSED.

Justice NEWBY did not participate in the consideration or decision of this case.