**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 07-19**

———————————

DANNY DEAN FROGGE,

        Petitioner - Appellant,

    v.

GERALD J. BRANKER, Warden, Central Prison, Raleigh, North
Carolina,

        Respondent - Appellee.

———————————

Appeal from the United States District Court for the Middle
District of North Carolina, at Durham.  N. Carlton Tilley, Jr.,
District Judge.  (1:05-cv-00502-NCT-WWD)

———————————

Argued: May 16, 2008          Decided: July 15, 2008

———————————

Before NIEMEYER, KING, and GREGORY, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.  Judge Gregory wrote
a dissenting opinion.

———————————

**ARGUED:** James Patrick Cooney, III, WOMBLE, CARLYLE, SANDRIDGE &
RICE, PLLC, Charlotte, North Carolina, for Appellant.  Valerie
Blanche Spalding, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,
North Carolina, for Appellee.  **ON BRIEF:** Don Willey, Jefferson,
North Carolina, for Appellant.  Roy Cooper, Attorney General of
North Carolina, Raleigh, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Danny Dean Frogge appeals the district court's denial of his federal habeas corpus petition, by which he seeks to have his North Carolina death sentence vacated. Frogge contends that he is entitled to such relief on the ground that his trial counsel was constitutionally ineffective by failing to develop and present, for sentencing purposes, mitigating evidence of his permanent organic brain damage. As explained below, we are constrained to affirm.

I.

A.

It is undisputed that, on the night of November 4, 1994, Frogge stabbed and killed his father, Robert Edward Frogge, and his invalid stepmother, Audrey Yvonne Frogge. In 1995, Frogge was tried and found guilty in the Superior Court of Forsyth County, North Carolina, on two counts of first-degree murder. The jury then considered whether Frogge should receive the death penalty for each of the murders. On the jury's recommendation, Frogge was sentenced to life imprisonment for the killing of his father, and to death for the murder of his stepmother. The Supreme Court of North Carolina thereafter granted him a new trial on the ground that inadmissible hearsay had been

3

introduced during the guilt phase of the 1995 trial.  See State

v. Frogge, 481 S.E.2d 278 (N.C. 1997).

At Frogge's second trial in 1998, he was found guilty on

two counts of first-degree murder, as well as an additional

count of robbery with a dangerous weapon.  Frogge was sentenced

to life imprisonment for the killing of his father, a concurrent

prison term for the robbery, and, on the jury's recommendation,

received a death sentence for the murder of his stepmother.  At

this trial, the jury had considered the death penalty only with

respect to his stepmother's murder.  Frogge appealed his death

sentence and the robbery conviction, and the state supreme court

affirmed.  See State v. Frogge, 528 S.E.2d 893 (N.C. 2000).  The

state supreme court summarized the facts of the case as follows:

> The State's evidence at defendant's second trial
> tended to show that defendant stabbed his father and
> bedridden stepmother to death.  At the time of the
> murders, defendant lived with his father and
> stepmother at their home in Winston-Salem.
> Defendant's father did not work, and his stepmother
> had been confined to her bed for over two years.
> Defendant worked part-time and helped around the
> house, but paid no rent.
>
> Between 4:00 and 4:30 a.m. on 5 November 1994,
> the Winston-Salem Police Department received a 911
> call from a person who identified himself as Danny
> Frogge.  Frogge reported that his parents were dead.
> When Winston-Salem police officers arrived at the
> scene, they found the bodies of Robert and Audrey
> Frogge in their bedroom.  Robert Frogge was found on
> the floor lying on his left side with bloodstains on

4

his shirt and arms. He had sustained ten stab wounds. A leather wallet, containing his driver's license and miscellaneous papers but no money, was found next to his body. The wallet, which was lying open, had a drop and a smear of blood inside. Near the wallet, a white, bloodstained sock was found. An iron bar from a lawnmower was found under Robert Frogge's body. Audrey Frogge was found in her hospital-type bed with bloodstains on her chest and arms. She had sustained eleven stab wounds to her chest. In addition, she suffered defensive knife wounds to her hand. A hospital-type rolling table stood beside the bed. Dr. Patrick Lantz, a forensic pathologist, opined that the angle of the stab wounds indicated the person stabbing Audrey Frogge either stood at the edge of the bed beside the table or climbed on the bed itself to deliver the blows.

Outside the home near the back porch, the officers found a bloodstained butcher knife. Just beyond the edge of the woods behind the house, the officers found men's clothing, including a pair of blue work pants, a pink tee shirt with red stains, a pair of men's underwear, and a white sock which contained bloodstains and blood spatter. The white sock appeared to match the sock found near Robert Frogge's body. The officers also collected several pairs of white underwear and blue work pants from defendant's bedroom which appeared similar to those found in the woods.

While talking further with the officers that night, defendant appeared calm and showed no signs of emotion. In a statement to Winston-Salem Police Detective Sergeant Dennis Scales, defendant claimed that on the day of the murders he had been in and out of the house on numerous occasions taking care of his stepmother and preparing her supper. After a night of drinking and crack cocaine use with friends, he returned to the home at approximately 4:00 a.m. and found his parents murdered.

5

The State also offered into evidence defendant's testimony from the sentencing proceeding of his first trial. This testimony included the following: On the day of the murders, defendant worked around the house and later met with Earl Autrey, Audrey Frogge's son-in-law, at approximately 2:00 p.m. The two began drinking. Defendant went back to his parents' home to prepare supper for his stepmother and later returned to Autrey's home to continue drinking. Subsequently, defendant returned to his parents' home. Defendant had consumed almost an entire pint of liquor and several beers. Defendant's father awoke from a nap between 8:00 and 8:30 p.m. and began to argue with defendant about his drinking. Defendant could not recall what he said to his father; however, his father became so upset that he took an iron bar from a lawnmower and jabbed and hit defendant four or five times. Defendant got up, went to the kitchen, and retrieved a butcher knife. He recalled stabbing his father three or four times while his father held the iron bar. Defendant did not remember stabbing his stepmother, but admitted that he must have done it. He then took approximately twenty-five or twenty-six dollars from his father's wallet. Defendant attempted to wash the blood from his hands. He then changed clothes and threw the soiled clothes in the woods behind the house. When asked how blood got inside his father's wallet, defendant stated that he did not know, but admitted it might have dropped from his hand. Defendant left and went to Kim Dunlap's house. He and Dunlap then rode with Dunlap's sister to downtown Winston-Salem. They used the money defendant had taken from his father's wallet to purchase crack cocaine. After smoking the crack, defendant and Dunlap returned to defendant's parents' home in a taxicab around 4:00 or 4:30 a.m. Defendant entered the house, but returned to the taxicab and said that his parents were dead. He then called the police.

Defendant elected to testify on his own behalf at his second trial. His testimony was similar to that given at his first sentencing proceeding. He testified he served over four years in prison for a previous second-degree murder conviction and that he

6

saved $ 8,000 to purchase a mobile home where he resided for six months after his release. Thereafter he returned to live with his father and stepmother. Defendant again admitted killing his father and stepmother and stated that after the murders, he changed his clothes and washed his hands. His testimony differed somewhat in that defendant claimed he did not take the money from his father's wallet until after he had washed his hands and was preparing to leave the house approximately thirty minutes after the murders. Defendant again admitted purchasing crack cocaine with the money he took from his father's wallet.

Frogge, 528 S.E.2d at 895-96. Following the state supreme court's affirmance of Frogge's death sentence for the murder of his stepmother, the Supreme Court of the United States denied Frogge's petition for writ of certiorari. See Frogge v. North Carolina, 531 U.S. 994 (2000).

B.

In 2001, Frogge filed a Motion for Appropriate Relief ("MAR") in the Superior Court of Forsyth County (the "MAR court"), alleging, inter alia, ineffective assistance of trial counsel. The MAR court conducted an evidentiary hearing on the ineffective assistance issue in August 2002 (the "MAR hearing"). By its Order of October 29, 2003, the MAR court granted relief to Frogge, ruling in his favor on the ineffective assistance claim, thus vacating the death sentence he had received for the murder of his stepmother and ordering a new sentencing hearing.

7

State v. Frogge, No. 94 CRS 44964 (N.C. Super. Ct. Oct. 29, 2003) (the "MAR Order").[1]

As described by the MAR court, Frogge's ineffective assistance claim "ar[ose] out of the alleged failure of trial counsel to investigate and offer evidence that at the time of the murders the defendant suffered permanent residual effects of a head injury sustained from a beating in 1990." MAR Order 8-9. Frogge maintained that his trial counsel should have arranged for neurological testing to assess whether the 1990 injury resulted in permanent organic brain damage and whether such brain damage contributed to the murders of his father and stepmother — an inquiry that, according to Frogge, "would have resulted in an opinion from an adequately qualified expert that as a result of [a brain damage-related] mental disturbance and consumption of alcohol, the defendant's capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law was impaired." Id. at 9 (internal quotation marks omitted). Frogge further contended

> that the failure to investigate, and to offer the evidence that would (or should) have been developed, was objectively unreasonable, satisfying the "performance" prong of the Strickland test. He then

---

[1]The MAR Order is found at J.A. 2124-52. (Our citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.)

8

> argue[d] that if the jury at the sentencing stage had been presented with this evidence, a reasonable probability exists that the ultimate result — recommendation of the death penalty — would have been different, satisfying the "prejudice" prong.

Id. at 9-10 (citing Strickland v. Washington, 466 U.S. 668 (1984)).[2]

The trial records and the MAR hearing evidence reflected that Frogge was represented by lead counsel Danny Ferguson and associate counsel David Freedman at both the 1995 and 1998 trials. During the sentencing phase of the 1995 trial, Frogge's sisters testified to changes they observed in Frogge's personality after the 1990 beating, and a defense expert, clinical psychologist Dr. Gary Hoover, opined that the resulting brain damage contributed to Frogge's murders of his father and stepmother. Dr. Hoover's methodology and opinion were challenged by the State's rebuttal expert, neuropsychiatrist Dr. Stephen I. Kramer, who perceived no link between the head injury and the murders of Frogge's parents. At least one juror on the 1995 jury found two statutory mitigating circumstances with respect to each of the murders: that Frogge was under the

---

[2]In its seminal Strickland decision, the Supreme Court recognized that an ineffective assistance claim requires showing (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687.

influence of a mental or emotional disturbance at the time of the offense, see N.C. Gen. Stat. § 15A-2000(f)(2) (the "'(f)(2)' mitigator"), and that he suffered from an impaired capacity to conform his conduct to the requirements of the law, see id. § 15A-2000(f)(6) (the "'(f)(6)' mitigator"). Thereafter, for the 1998 trial, Frogge's counsel replaced Dr. Hoover with another expert, clinical psychologist Dr. William Tyson, who testified during the guilt phase — in an attempt to avoid first-degree murder convictions — that Frogge possibly suffered from a personality disorder and that he likely had been acting on impulse with limited ability to reason at the time of the murders; Dr. Tyson did not mention Frogge's 1990 head injury or opine on its effects. The State again presented Dr. Kramer as its rebuttal expert, and Frogge's sisters again gave nonexpert testimony (during the sentencing phase) regarding the head injury. The 1998 jury did not find either the "(f)(2)" mitigator or the "(f)(6)" mitigator with respect to the murder of Frogge's stepmother.[3]

---

[3]The jury at the 1995 trial had found four aggravating circumstances with respect to each of the murders, including that Frogge had previously been convicted of a violent felony (i.e., second-degree murder in 1985), that the murders of his father and stepmother occurred during the commission of a robbery, that these murders were "especially heinous, atrocious, or cruel," and that each murder was part of a course of conduct in which Frogge engaged in a separate violent crime against

10

In its MAR Order, the MAR court made the following findings

of fact, based on the evidence presented to it:

> 1. For the 1995 trial, the defendant's trial
> counsel engaged and offered testimony from a
> psychologist, Dr. Hoover.

---

another person. J.A. 669-70, 679-80. The 1995 jury also found — in addition to the statutory "(f)(2)" and "(f)(6)" mitigators discussed above — ten other mitigating circumstances regarding the murder of Frogge's father: Frogge had been physically and emotionally abused as a child by his father; had been sold as a child by his father to another man for purposes of child molestation; had helped to cook for and look after his father and stepmother; had committed the murders after being provoked by his father; had consumed alcohol at the time of the murders; had been under the influence of alcohol at that time; had a lengthy history of drug and alcohol abuse; had admitted his guilt; had made no attempt to flee or evade arrest after the murders; and had made himself available to the investigating officers. The jury found six of these additional mitigating circumstances with respect to the murder of Frogge's stepmother. For both murders, the jury concluded that the mitigating circumstances were insufficient to outweigh the aggravating ones. The jury recommended the death penalty, however, for only the murder of Frogge's stepmother.

The jury at the 1998 trial — which considered the death penalty with respect to only the stepmother's murder — found the same four aggravating circumstances that had been found by the 1995 jury. The 1998 jury also found the following six mitigating circumstances: that Frogge had been physically and emotionally abused as a child by his father; had, during his childhood, repeatedly watched his father physically, emotionally, and sexually abuse his mother and sisters; had a lengthy history of drug and alcohol abuse; had admitted his guilt; had adjusted well to being in custody; and had made himself available to the investigating officers. Of course, as a prerequisite to its recommendation of the death penalty, the jury also found that the mitigating circumstances were insufficient to outweigh the aggravating circumstances.

11

2.   Dr. Hoover testified in the form of opinion that at the time of the homicides in 1994, the defendant suffered from "[d]elirium due to multiple etiologies, substance intoxication delirium, alcohol [sic] and mood disorder due to postconcussive disorder."

3.   Dr. Hoover described the latter as "the aftermath of a head injury that [Frogge] sustained in 1990 that left him with residual mood difficulties and cognitive functions, intellectual skills . . . [that] caused him to have episodic seizures, slurred speech and increased irritability, more withdrawn type of personality, episodes of paranoia over the years."

4.   In Dr. Hoover's opinion, the "postconcussive" disorder combined with substance-induced delirium to produce explosive rage provoked by the defendant's father.

5.   Dr. Hoover based his diagnosis in part on "known" correlation between "residual behavioral difficulties" and head injuries, and the descriptions provided to him of marked differences in the defendant's behavior after the injury.

6.   During cross-examination, Dr. Hoover admitted that he had done no neurological or neuropsychological testing of the defendant, stating that medical records and behavioral information provided were sufficient for the "diagnosis."

7.   The State offered rebuttal expert testimony from Dr. [K]ramer, a neuropsychiatrist, who disagreed with Dr. Hoover's opinion concerning "delirium."

8.   Dr. [K]ramer said that Dr. Hoover's conclusions were "not supported," and lacked "data."

9.   Dr. [K]ramer's own review of the medical records concerning the 1990 head injury did not support a conclusion that it had any effect on the defendant in 1994.

12

10. Dr. [K]ramer testified that tests could have been done on the defendant to determine whether the head injury contributed to the homicides in 1994, but that none were done.

11. At the 1995 sentencing phase, the "(f)(2)" and "(f)(6)" mitigators were submitted to the jury, and were found by at least one juror; however, with respect to the murder of Audrey Frogge, the jury did not find that the mitigating factors found outweighed the aggravating factors, and recommended death.

12. For the 1998 trial, defense counsel elected not to use Dr. Hoover again, and engaged another psychologist, Dr. Tyson.

13. During the 1998 trial, Dr. Tyson testified that at the time of the homicides, the defendant suffered from a "personality disorder . . . defined as a pervasive limitation to adult functioning that had been aggravated by long term substance abuse and dependence," as a result of which "it was most likely he would have been acting on impulse with limited ability to reason."

14. Dr. Tyson did not perform or request any neurological or neuropsychological tests on the defendant, and none were done. His diagnosis was not supported by reliance on any such tests, review of medical records concerning the 1990 head injury or descriptions by family and friends of changes in the defendant's behavior after that injury.

15. Lay witnesses who testified during the 1998 trial described changes in the defendant's behavior after the 1990 head injury.

16. During the 1998 sentencing phase, which pertained only to the Audrey Frogge murder, the "(f)(2)" and "(f)(6)" mitigators were submitted to the jury, but neither was found, and the jury again recommended death.

13

17.   Trial counsel decided not to use Dr. Hoover in favor of Dr. Tyson because of dissatisfaction with Dr. Hoover and respect for Dr. Tyson's abilities.

18.   Claudia R. Coleman, Ph.D., a psychologist specializing in neuropsychology and forensic psychology, reviewed various written materials concerning the defendant and conducted physical and other examinations of the defendant in preparation for the MAR hearing.

19.   Among the materials reviewed by Dr. Coleman were portions of the record of the 1995 and [1998] trials (including testimony of Drs. Hoover, [K]ramer and Tyson), the defendant's criminal record and affidavits from family members and friends.  She also reviewed a psychological report done by Dr. Tyson in 1998 and medical records that included information about the 1990 head injury.

20.   Dr. Coleman also personally met with the defendant twice, and performed a neuropsychological evaluation to determine if he suffered residual deficits from the head injury.

21.   Dr. Coleman testified that the defendant suffered a closed head injury, that he spent several days in the hospital, that he was "in and out" of clear mental status during that time, that at discharge he had speech and memory problems, that he became "more explosive" and was more "easily agitated," that he had a lower tolerance for frustration, that he became more withdrawn, and that he became "quite paranoid and fearful of others."

22.   Dr. Coleman administered several tests on the defendant, including the Weschler Adult Intelligence Scale, the Weschler Memory Scale and the Rhey Auditory Verbal Learning Test.  She also tested motor, visual, spatial and language skills, and performed brain injury-specific tests.  She also administered tests to detect evidence of malingering.

23.   Dr. Coleman observed that the defendant did well on some of the tests, and poorly on others,

14

particularly in verbal and visual memory processes. She considered these results to be consistent with brain injury in the temporoparietal area, which was the area involved in the 1990 head injury.

24. Based on her review of the materials provided to her, her examination of the defendant, including test results, and her education and training, Dr. Coleman diagnosed the defendant with "cognitive disorder NOS [not otherwise specified]," personality disorder, combined type, with paranoid and aggressive features, and with "polysubstance dependence." The cognitive and personality disorders were causally linked to the head injury.

25. Dr. Coleman formed an opinion that the residual effects of the defendant's brain injury in 1990 significantly affected his behavior at the time of the Audrey Frogge murder. She concluded that these effects made it more difficult for the defendant to control his emotions and impulses, and to consider the consequences of his conduct.

26. In Dr. Coleman's opinion, at the time of the Audrey Frogge murder, partially as a result of the brain injury, the defendant suffered from diminished capacity fully to weigh and understand the consequences of his actions. She further determined that he committed the murder while under the influence of such conditions and that his ability to appreciate the criminality of his conduct and conform that conduct to the requirements of law was impaired.

27. Thomas M. Hyde, M.D., Ph.D., a neurologist, conducted a neurological evaluation of the defendant in June 2002, and reviewed Dr. Coleman's report, affidavits, hospital records and a portion of trial transcript. He observed several abnormalities, including attention and visual deficits, motor weakness and clumsiness. He concluded that the defendant has organic brain damage, referable to the frontal and parietal lobes, resulting from the 1990 head injury. In his opinion, the defendant had a significant closed head injury in 1990 that produced permanent and irreversible brain damage, which under

15

extreme distress would lead him to act impulsively, with impaired judgment, reasoning and impulse control.

28.  If the defendant's trial counsel had been aware of Dr. Hyde's opinions in 1998, and if Dr. Hyde were available as a witness and counsel was otherwise satisfied that Dr. Hyde was a credible expert, he would have used Dr. Hyde's opinion at trial.

MAR Order 10-16 (internal citations omitted) (some alterations in original).

Turning to the performance prong of the Strickland analysis, the MAR court focused heavily on two decisions: Wiggins v. Smith, 539 U.S. 510 (2003) (concluding petitioner entitled to habeas corpus relief based on counsel's failure to investigate and present available mitigating evidence), and Byram v. Ozmint, 339 F.3d 203 (4th Cir. 2003) (distinguishing Wiggins and finding no ineffective assistance, where counsel conducted thorough investigation and made strategic decision not to present potentially damaging evidence).  See MAR Order 19-22. The MAR court concluded that

[t]he circumstances here are more similar to Wiggins than to Byram.  Counsel knew of Frogge's head injury, but did not investigate with the assistance of expert consultation the potential mitigation evidence of "organic brain damage" and its effects on his ability to control violent impulses.  Counsel here had the "benefit" of Dr. [K]ramer's criticism of Dr. Hooper's testimony in the 1995 trial — the "roadmap" that post-conviction counsel now say was available.  While true that the effects of Frogge's head injury include anti-social behavior that could be damaging to his case, trial counsel's failure to investigate was not

16

influenced by that circumstance. Like trial counsel in Wiggins, Frogge's trial counsel turned their focus to other concerns, and were "inattentive" to the potential mitigating evidence arising out of the head injury. Frogge had the benefit of good lawyers with experience in capital cases, but Wiggins compels the conclusion that their failure to pursue the evidence of organic brain injury as has now been done in post-conviction proceedings was objectively unreasonable. From the evidence, applying applicable case law, this Court concludes that the defendant has met the burden of proof on the performance prong of the Strickland test.

Id. at 22-23. Next, with respect to the prejudice prong of the Strickland analysis, the MAR court determined that, "[c]onsidering all of the circumstances, . . . the evidence of the effects of organic brain injury is of such nature and potential persuasive effect that the lack of it due to ineffective assistance undermines confidence in the fairness of the 1998 sentencing phase." Id. at 29. Accordingly, the MAR court ruled that "[t]he MAR for a new sentencing hearing should be granted." Id.

C.

The State appealed the MAR Order to the Supreme Court of North Carolina. By its decision of February 4, 2005, the state supreme court reversed the MAR court and reinstated Frogge's death sentence. See State v. Frogge, 607 S.E.2d 627 (N.C. 2005) (the "State Decision"). In so doing, the state supreme court recognized that, in reviewing the MAR Order, the relevant

17

questions were "whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the [MAR] court." Id. at 634 (internal quotation marks omitted). The state supreme court ultimately reversed the MAR court by finding fault with its analysis on the performance prong of the Strickland test, without reaching the prejudice prong. Id. at 637.

The state supreme court began its State Decision by reviewing the relevant factual and procedural history — covering the 1995 trial, the 1998 trial, and the MAR court proceeding. See Frogge, 607 S.E.2d at 628-33. In substantial part, the state supreme court focused on matters beyond those discussed in the MAR Order. For instance, essential to its State Decision, the state supreme court observed the following with respect to the pretrial investigatory efforts made by Frogge's lawyers:

> [W]hile preparing for defendant's second trial, defense counsel provided Dr. Tyson with their entire discovery file; advised him as to defendant's head injury, the resulting perceived changes in his personality, and the significance that family members placed on the injury; and made available to him defendant's medical records. The material supplied to Dr. Tyson also included the testimony given at [the 1995 trial] by Drs. Hoover and Kramer, and attorney Freedman believed that Dr. Tyson testified in [the 1998 trial] that he had reviewed this testimony. Even possessing this information, Dr. Tyson advised

18

attorney Ferguson that he would not change his diagnosis.

In deciding prior to [the 1998 trial] whether to pursue evidence of defendant's head injury as potentially mitigating evidence, defense counsel testified that they depended on Dr. Tyson's expertise. Although attorney Ferguson acknowledged during the MAR hearing that he knew Dr. Tyson was not a neurologist or neuropsychologist and could not render neurological opinions, he added, "I think he had the ability to tell me that if it was significant where we should go next. And he didn't indicate that there was any significance, that [the head injury] was significant. So, I relied on what he said." When cross-examined, attorney Ferguson reaffirmed that he depended on Dr. Tyson's informed opinion:

> Q. Now, I think you made it clear this morning, I just want to be sure, that you advised Doctor Tyson, or discussed with him more than once, the concerns of the family members about the personality changes they observed in the Defendant after the beating in 1990, is that correct?
>
> A. Yes.
>
> Q. And you asked him whether that was significant, in his opinion?
>
> A. Yes.
>
> Q. And he was firm on saying no, it would not change my diagnosis, was he not?
>
> A. Yes.
>
> Q. And you felt entitled to rely on the superior knowledge of an expert?
>
> A. That's correct.

Attorney Ferguson reemphasized the point during a similar exchange later in the hearing:

19

> Q. Doctor Tyson did not specifically focus on the head injury, did he?
>
> A. No, and as I've said earlier, he was told about it, provided the information, and did not deem it significant.
>
> Q. Yes, sir. And yet he made that decision without [the] benefit of any type of neurological or neuropsychological testing?
>
> A. Yes, sir, I assume that he had the — at least the qualifications to make that decision, whether neurological testing might be needed; and he was much more qualified to make that decision than I was, and [w]e relied on his opinion.
>
> All this testimony indicates that defense counsel relied both on Dr. Tyson's diagnosis of defendant's condition and on his informed opinion that additional testing or experts were not needed.

Id. at 632-33 (some alterations in original).

Turning to its analysis of Frogge's ineffective assistance claim, and invoking the Supreme Court's decisions in Strickland and Wiggins, the state supreme court emphasized the proposition that a court must "review counsel's[] decisions in light of the information available to them at the time and not with the benefit of hindsight." Frogge, 607 S.E.2d at 634 (citing Wiggins, 539 U.S. at 523; Strickland, 466 U.S. at 689). The state supreme court then observed

> that counsel had numerous pertinent factors to consider as they decided their strategy for

20

defendant's second sentencing proceeding. First, defendant had committed a murder prior to suffering the head injury. Second, graphic lay evidence of defendant's 1990 head injury and its sequelae had been presented through his sisters and others close to him at the [1995] trial and would be presented again. Third, at the [1995] sentencing proceeding, Dr. Hoover had presented an expert psychological opinion that took into account both defendant's head injury and his background. The sentencing jury, having heard that evidence, returned a capital verdict. Fourth, Dr. Kramer criticized Dr. Hoover for failing to conduct additional psychological testing that might determine whether defendant's head injury was a contributing factor to the murders. However, Dr. Kramer went on to state that, in his opinion, the 1990 injury was of mild to moderate severity and defendant's prognosis on discharge was good, implying that the additional psychological testing was unlikely to bear fruit. Dr. Kramer did not indicate that in preparation for trial defendant should have been tested for organic brain damage or neurological harm resulting from the 1990 head injury. Fifth, defense counsel were dissatisfied with Dr. Hoover's performance in [the 1995 trial] and replaced him with Dr. Tyson, who had been an effective witness in the past for attorney Freedman. When supplied with defendant's medical and social histories and with transcripts of the proceedings in [the 1995 trial], Dr. Tyson stood by his opinion that defendant suffered from a personality disorder and, at the time of the murders, was acting on impulse with limited ability to reason.

Id. at 634-35. After outlining these factors, the state supreme

court recognized that "we must now decide whether, under

Wiggins, the trial court properly concluded that defense

counsel's decision not to pursue evidence of organic brain

damage through neurological testing was objectively unreasonable

21

and undermined confidence in the verdict." Id. at 635. The state supreme court engaged in this assessment as follows:

> The test in Wiggins is whether a strategic decision was made after sufficient investigation, not whether that decision was later proven to be correct. Unlike counsel in Wiggins, who abandoned the idea of pursuing a defense based on mitigation after reviewing only a psychological report, [social services] records, and a presentence investigation report, defense counsel here interviewed defendant and his siblings and obtained defendant's school records, hospital records, correctional systems records, and psychological reports. Thus, defendant's counsel cannot be said to have "acquired only rudimentary knowledge of [defendant's] history from a narrow set of sources." Wiggins, 539 U.S. at 524. Defendant's attorneys also had the benefit of watching the first trial unfold and seeing what worked and what did not. Specifically, a defense which took defendant's head injury into account had been unsuccessful. By the time defense counsel were preparing for defendant's second trial, they had consulted two mental health experts, Drs. Hoover and Tyson, both of whom had full access to defendant, his family, and the pertinent medical records of defendant's head injury, and neither of whom recommended neurological testing.
>
> In addition, defense counsel testified that they depended on Dr. Tyson to advise them whether or not additional testing of defendant was needed but that, after receiving all the information from the first trial, Dr. Tyson stuck by his original diagnosis of defendant. This testimony indicates that defense counsel were prepared to seek such testing if they had adequate reason to believe it was necessary or would be useful.

Frogge, 607 S.E.2d at 635. Finally, after surveying decisions in what it deemed to be analogous cases, the state supreme court concluded as follows:

22

[W]here the record demonstrates (1) defense counsel fully investigated defendant's social and medical history and provided that information to Drs. Hoover and Tyson, (2) neither expert indicated to counsel a necessity for neurological testing, and (3) counsel relied on their experts as they made the difficult but necessary choices as to which theory of defense to pursue, we are unwilling to find that the decisions of defendant's attorneys constituted ineffective assistance of counsel or represented inattention to other possible defenses. Accordingly, we conclude that defense counsel did not prematurely abandon a defense based on organic brain damage and that their election to pursue a defense predicated on other grounds constituted a "'reasonable professional judgment[].'" Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691).

Frogge, 607 S.E.2d at 637 (second alteration in original). Thus, without reaching the prejudice prong of the Strickland test, the state supreme court reversed the MAR court and reinstated Frogge's death sentence. Id. at 637-38.

D.

In June 2005, Frogge filed his federal habeas corpus petition in the Middle District of North Carolina, asserting, inter alia, his ineffective assistance claim, by which he challenges his death sentence. On March 28, 2006, the magistrate judge recommended that Frogge's petition be denied. See Frogge v. Polk, No. 1:05-cv-00502 (M.D.N.C. Mar. 28, 2006)

23

(the "Recommendation").[4]   With respect to the ineffective

assistance claim, the magistrate judge concluded that

> [a] review of the record supports the ruling of the North Carolina Supreme Court; trial counsel's decision not to pursue evidence of organic brain damage through neurological testing was not contrary to or an unreasonable application of Strickland or its progeny. There is no requirement to 'shop around' for a more favorable expert opinion and the hindsight of a later obtained diagnosis does not render representation ineffective.   Even assuming arguendo that this court in its independent judgment believed that trial counsel were in error for failing to pursue neurological testing, the deferential standard of review under the [1996 Antiterrorism and Effective Death Penalty Act] precludes relief.   As noted, the North Carolina Supreme Court's decision is neither unreasonable nor substantially different from relevant United States Supreme Court precedent.   [Frogge's ineffective assistance claim] should, therefore, be denied.

Recommendation 19-20 (internal citations omitted).   On June 5,

2006, the district court summarily adopted the Recommendation in

a two-page Order, thus rejecting Frogge's ineffective assistance

claim and denying his federal habeas corpus petition.   See

Frogge v. Polk, No. 1:05-cv-00502 (M.D.N.C. June 5, 2006).[5]   The

district court also denied Frogge a certificate of appealability

("COA").[6]   On February 22, 2008, however, we granted Frogge a COA

---

[4]The magistrate judge's Recommendation is found at J.A. 2325-49.

[5]The district court's Order is found at J.A. 2359-60.

[6]By its Order, the district court sua sponte denied Frogge a

on his ineffective assistance claim.  We possess jurisdiction over Frogge's appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

---

COA.  Frogge thereafter filed a motion to alter or amend judgment.  On July 19, 2006, the magistrate judge recommended that the motion be denied with respect to Frogge's request therein to revisit the merits of his ineffective assistance claim, but granted with respect to his request to delete the denial of the COA and replace it with language recognizing Frogge's right to seek a COA within thirty days.  On October 24, 2007, the district court adopted the magistrate judge's recommendations.  Frogge then filed an application in the district court for a COA, which was rejected by the district court on December 22, 2007.

## II.

We review de novo a district court's denial of federal habeas corpus relief on the basis of a state court record.  See Tucker v. Ozmint, 350 F.3d 433, 438 (4th Cir. 2003).  Because the Supreme Court of North Carolina adjudicated Frogge's habeas corpus claim on the merits, the State Decision is entitled to deference pursuant to the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA").  See 28 U.S.C. § 2254(d).  Under AEDPA, we may award relief only if (1) the state court adjudication of the issue on its merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id.  State court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence.  Id. § 2254(e)(1).

## III.

Frogge contends that we should vacate his death sentence under 28 U.S.C. § 2254(d), because the State Decision "involved an unreasonable application of" Supreme Court precedent — in

26

that the state supreme court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of" his case, Williams v. Taylor, 529 U.S. 362, 413 (2000) — and also because the State Decision "was based on an unreasonable determination of the facts in light of the evidence presented in the" MAR court proceeding. As discussed above, the state supreme court reversed the MAR court by finding fault with its analysis on the performance prong of the Strickland test, without reaching the prejudice prong. See Strickland v. Washington, 466 U.S. 668, 687 (1984) (recognizing that an ineffective assistance claim requires showing (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense"). In so doing, the state supreme court largely relied on the Strickland analysis in Wiggins v. Smith, 539 U.S. 510 (2003). See State v. Frogge, 607 S.E.2d 627, 635 (N.C. 2005) (observing that "[t]he test in Wiggins is whether a strategic decision was made after sufficient investigation, not whether that decision was later proven to be correct").

The state supreme court concluded, in short, that trial counsel's decision to abandon further pursuit of evidence of Frogge's permanent organic brain damage was not the result of an insufficient investigation. Rather, the court ruled that

27

counsel exercised reasonable professional judgment by "fully investigat[ing] defendant's social and medical history" — alerting counsel to the 1990 head injury — "and provid[ing] that information" to defense experts Dr. Hoover (for the 1995 trial) and Dr. Tyson (for the 1998 trial). Frogge, 607 S.E.2d at 637. When "neither expert indicated to counsel a necessity for neurological testing," it was then reasonable for "counsel [to rely] on their experts as they made the difficult but necessary choices as to which theory of defense to pursue." Id. Indeed, as the supreme court recognized, counsel did not know at the time they were preparing for the 1998 trial whether — as Dr. Hoover had testified at the 1995 trial without having performed neurological tests — Frogge truly suffered from permanent organic brain damage which contributed to the murders of his father and stepmother. Dr. Hoover's testimony had been discredited by the State's expert, Dr. Kramer, who himself had opined that there was no link between the head injury and the murders. Thereafter, counsel provided information to Dr. Tyson about the head injury, and Tyson convinced them that no additional testing or experts were needed.

In seeking federal habeas corpus relief, Frogge asserts that his trial counsel provided constitutionally ineffective assistance at the 1998 trial by: relying on Dr. Tyson, who was

28

neither a medical doctor (much less a neurologist) nor qualified to perform neurological or neuropsychological tests; allowing a long delay between the grant of the retrial (on March 7, 1997) and Dr. Tyson's two examinations of Frogge (on February 16 and March 9, 1998); receiving Dr. Tyson's report on March 12, 1998, just two days before the new trial began (on March 14, 1998) and two weeks before Tyson testified (on March 26, 1998); advising Dr. Tyson of the head injury only after February 16, 1998;[7] and failing to actually provide Dr. Tyson with — rather than merely offering to make available to him — pertinent documents, including head injury-related medical records and statements from Frogge's family members.  According to Frogge, "the circumstances surrounding Dr. Tyson's selection and evaluation lead to only one reasonable conclusion:  defense counsel's failure to discover this evidence [of permanent organic brain damage] was the result of inattention and neglect, not 'sound, evidence-based judgment.'"  Br. of Appellant 31 (quoting <u>Meyer v. Branker</u>, 506 F.3d 358, 371 (4th Cir. 2007) (recognizing that "the touchstone of effective representation must be sound,

---

[7]Lead counsel Ferguson testified at the MAR hearing that he "remember[ed] calling Doctor Tyson, who had already conducted some . . . testing and done an evaluation, or was in the process of doing an evaluation, and telling Doctor Tyson that this [head injury] might be significant, and asking him did I need to do anything.  How did that affect his evaluation?"  J.A. 1875.

evidence-based judgment, rather than a set of mandates counsel must programmatically follow without deviation")).

Unfortunately for Frogge, although we might be inclined to rule favorably on his ineffective assistance claim if we were assessing it under a less deferential standard of review, we cannot say that the State Decision "involved an unreasonable application of" Supreme Court precedent, as required by AEDPA to grant federal habeas corpus relief. 28 U.S.C. § 2254(d); see also Williams, 529 U.S. at 409 ("Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."). The relevant precedent certainly includes Strickland and Wiggins, in which the Supreme Court instructed:

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

Wiggins, 539 U.S. at 521-22 (quoting Strickland, 466 U.S. at 690-91). The Wiggins Court further explained that, "[i]n

30

assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Id. at 527.

In the circumstances presented here, it was not objectively unreasonable for the state supreme court to determine, in reliance on Strickland and Wiggins, that Frogge's trial counsel made a valid strategic choice not to further pursue evidence of permanent organic brain damage once they informed Dr. Tyson about the 1990 head injury and he declined to recommend additional testing or experts. Cf. Wilson v. Greene, 155 F.3d 396, 403 (4th Cir. 1998) (observing that, where counsel had received psychologist's report opining that defendant was not mentally ill at time of offense, "counsel was not required to second-guess the contents of this report," but rather "understandably decided not to spend valuable time pursuing what appeared to be an unfruitful line of investigation" (internal quotation marks omitted)). We conclude that the State Decision was not objectively unreasonable despite the known lack of qualifications on the part of Dr. Tyson to perform neurological or neuropsychological tests; that is, it was not objectively unreasonable for the state supreme court to accept counsel's MAR hearing testimony that they believed Dr. Tyson at least

31

possessed the ability to determine whether such testing was necessary and justifiably relied on his view in this regard. We also conclude that the State Decision was not objectively unreasonable regardless of the circumstances of Dr. Tyson's evaluation of Frogge and consultation with counsel — including the timing thereof — which Frogge has not sufficiently shown to have influenced Dr. Tyson's expert opinion and advice.

In addition to rejecting the proposition that the State Decision "involved an unreasonable application of" Supreme Court precedent, we also cannot say that the State Decision "was based on an unreasonable determination of the facts in light of the evidence presented in the" MAR court proceeding. 28 U.S.C. § 2254(d); see also Wiggins, 539 U.S. at 528 (recognizing that a clear factual error "reflects 'an unreasonable determination of the facts'" under § 2254(d), and that, in the particular circumstances before it, the state court's "partial reliance on an erroneous factual finding further highlight[ed] the unreasonableness of the state court's decision"). Frogge attacks several aspects of the state supreme court's characterization of the facts, including the following observations:

- "[D]efense counsel provided Dr. Tyson with their entire discovery file . . . and made available to

32

him defendant's medical records," <u>Frogge</u>, 607 S.E.2d at 632;

- "The material supplied to Dr. Tyson also included the testimony given at [the 1995 trial] by Drs. Hoover and Kramer, and attorney Freedman believed that Dr. Tyson testified in [the 1998 trial] that he had reviewed this testimony," <u>id.</u>; and

- "By the time defense counsel were preparing for defendant's second trial, they had consulted two mental health experts, Drs. Hoover and Tyson, <u>both of whom had full access to defendant, his family, and the pertinent medical records of defendant's head injury</u>, and neither of whom recommended neurological testing," <u>id.</u> at 635 (emphasis added).

According to Frogge, these observations reflect that the state supreme court based its State Decision on the erroneous propositions that counsel had actually provided Dr. Tyson with pertinent documents, including head injury-related medical records and statements from Frogge's family members, and that Dr. Tyson had reviewed all of the 1995 trial testimony of Drs. Hoover and Kramer. Frogge asserts that, in fact, Dr. Tyson did not receive copies of the medical records and family member statements, and his own testimony at the 1998 trial indicated that he did not fully review the 1995 expert testimony. Although we can understand how one might interpret the somewhat ambiguous State Decision as Frogge has, a close reading reflects that the state supreme court merely observed (with support in the record) that counsel provided Dr. Tyson with an undefined

33

"discovery file" and the expert testimony from the 1995 trial; told him about the 1990 head injury, thereby providing him with the relevant information; and made available to him pertinent medical records and family member statements. The state supreme court further observed that counsel believed Dr. Tyson reviewed the 1995 expert testimony, and that counsel decided not to pursue the permanent organic brain damage evidence after informing Dr. Tyson of the head injury and being advised by him that no further testing or experts were needed. The state supreme court did <u>not</u> aver that counsel actually provided Dr. Tyson with the medical records and family member statements, or that Dr. Tyson fully reviewed the 1995 expert testimony. Accordingly, the state supreme court made no clear factual errors.

Finally, Frogge takes issue with the state supreme court's suggestion that counsel's decision to forego testing for permanent organic brain damage was informed, at least in part, by the "failure" of the head injury defense in the 1995 trial. <u>See, e.g.</u>, <u>Frogge</u>, 607 S.E.2d at 635 (observing that, in preparing for the 1998 trial, counsel "had the benefit of watching the first trial unfold and seeing what worked and what did not[, including the unsuccessful] defense which took defendant's head injury into account"). Although we agree with

34

Frogge that the record does not support the proposition that counsel's 1998 trial strategy was based on the failure of the 1995 head injury defense, any contrary suggestion by the state supreme court is not ultimately necessary to its bottom-line conclusion that counsel reasonably relied on the advice of Dr. Tyson.

IV.

Pursuant to the foregoing, we must affirm the Order of the district court denying Frogge's petition for federal habeas corpus relief.

<u>AFFIRMED</u>

35

GREGORY, Circuit Judge, dissenting:

Because "[d]eath is different[,]" <u>Gregg v. Georgia</u>, 428 U.S. 153, 188 (1976), an attorney's failure to present mitigating evidence in a capital case takes on heightened significance. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). While my colleagues provide a thorough recitation of the facts, they fall short in applying the Sixth Amendment, which guarantees every defendant effective assistance of counsel. <u>Id.</u>

<u>Strickland</u> and its progeny establish that trial counsel is constitutionally obligated to provide effective assistance and to comport with prevailing professional norms. <u>Id.</u> Counsel must also investigate and introduce mitigating evidence unless he or she could "reasonably surmise" that evidence "would be of little help." <u>Id.</u> at 699; <u>Wiggins v. Smith</u>, 539 U.S. at 525 (holding that counsel's failure to investigate mitigation evidence was ineffective but noting that further investigation is excusable where counsel has evidence suggesting it would be fruitless). In capital cases where a defendant does not claim actual innocence and the jury only has one choice – life imprisonment or death, counsel's <u>sole</u> role is to advocate effectively for a life sentence.

Here, defense counsel ("David Freedman" and "Danny Ferguson," collectively "defense counsel") knew that before

36

murdering his father, Robert, and step-mother, Audrey, Frogge suffered a subdural hematoma and a subarachnoid hemorrhage to his brain, significantly altering his personality and ability to function. Specifically, Frogge had speech problems, memory problems, and exhibited personality changes. He became more fearful, anxious, paranoid, easily agitated, and explosive. In Frogge's first trial ("Frogge I"), defense counsel secured Dr. Hoover, a neuropsychologist, to testify that the brain injury induced Frogge's violent actions. But in Frogge's second trial ("Frogge II") defense counsel did not introduce the brain injury or seek neurological testing from an expert qualified to evaluate the extent to which that injury affected Frogge. The Superior Court of Forsyth County's ("MAR Court") held that defense counsel's failure to conduct neurological testing and introduce Frogge's brain injury was ineffective assistance of counsel. The North Carolina Supreme Court reversed the MAR Court and found that defense counsel's failure to do so was a sound and strategic trial tactic. When "directly assessed for reasonableness in all the circumstances," this holding is untenable. Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 690-91).

In my view, one cannot, on this record, "reasonably surmise" that the evidence of Frogge's organic brain damage

37

would have been of "little help."  Hence, my principal concern is not whether counsel should have presented a mitigation case, but rather whether counsel's failure to seek neurological testing from an expert qualified to evaluate conditions known to exist was *itself reasonable*.  Wiggins, 539 U.S. at 523.  As the majority, remarkably answers this question affirmatively, I must dissent.

I.

The Supreme Court, in Wiggins, held that it is constitutionally ineffective for counsel not to investigate and introduce mitigating evidence of a defendant's social background.  539 U.S. at 525.  Although aware of Wiggins's unfortunate childhood, counsel in Wiggins did not investigate his family and social history, which revealed that he was abused, and had limited intellectual capacities and a childlike emotional state.  Id. at 516.  The post-conviction court concluded that the decision not to investigate was strategic and, thus, not ineffective.  Id. at 519; see also Strickland, at 690-91 ("Strategic choices made after thorough investigations are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the

38

limitations on investigation"). The Supreme Court resoundingly rejected the post-conviction court's holding, concluding that the investigation was inadequate and a reasonable competent attorney would have realized that pursing those leads was necessary to making an informed choice among possible defenses. Id. at 526, 534.

Similarly in Rompilla v. Beard, 545 U.S. 374 (2005), the Supreme Court found Rompilla's counsel ineffective for failing to review Rompilla's court file and to present significant mitigating evidence about Rompilla's childhood, mental capacity, alcoholism, and prior conviction. Id. Noting that counsel unreasonably relied on family members and medical experts to tell them what records might be useful in Rompilla's mitigation case, the Court stated: "[t]here is no need to say more, however, for a further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction." Id. at 383.


II.

Here, the majority upholds the State Supreme Court's objectively unreasonable application of Strickland's principles. The State Supreme Court reversed the MAR Court on the basis that: (1) defense counsel conducted more than a sufficient

39

investigation; and (2) it was a sound strategic defense to rely on expert opinion since the expert, Dr. Tyson, had Frogge's medical records and Frogge I transcripts. The record does not support either holding.

To their credit, defense counsel in Frogge I did investigate and present a persuasive mitigation case. But see Wiggins, 539 U.S. at 524 (noting that counsel abandoned their investigation of Wiggins's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.). However, for Frogge II, where the only salient issue was whether Frogge would receive a death sentence for Audrey Frogge's murder, defense counsel clearly demonstrated a lack of attention to investigating and presenting critical mitigation evidence in a capital case.

In Frogge I, State expert, Dr. Kramer, undercut Dr. Hoover's opinion primarily on the basis that Dr. Hoover did not conduct neurological testing in support of his opinion that Frogge's brain injury was permanent and affected his mental capabilities. Because, in their view, Dr. Hoover testified poorly, defense counsel sought out a new expert for the second trial. Remarkably, defense counsel hired Dr. Tyson, a clinical psychologist, not specialized in neuroscience or neuropsychology, and who by his own admission could not perform

40

the relevant neurological tests. (J.A. 1109.) Notwithstanding knowledge of Frogge's brain injury and the need for neurological testing, defense counsel waited until the eve of Frogge's second trial to ask Dr. Tyson, whether Frogge's brain injury "affect[ed] his evaluations." (J.A. 1875.) Even though at least one juror found that Dr. Hoover's testimony in the first trial supported the statutory mitigating factor of mental illness, defense counsel accepted Dr. Tyson's opinion that the brain injury was irrelevant. Having not provided any family statements or Frogge's medical records to Dr. Tyson, it was unreasonable for defense counsel to rely on or, in the majority's words, be "convinced" by Dr. Tyson's uninformed opinion. (Maj. Op. at 28.) Moreover, given that Dr. Kramer eviscerated Dr. Hoover's opinion based on his failure to conduct neurological testing, it is unfathomable that defense counsel would not obtain such testing to shore up this glaring weakness.

What is more, there is no evidence that defense counsel's failure to conduct neurological testing and present Frogge's brain injury was a "strategic" decision. Defense counsel did not testify or even suggest that they thought it a better strategy to not present the brain injury evidence. The ABA Guidelines for Appointment and Performance of Defense Counsel in Death Penalty Cases notes that mental health mitigation evidence

41

is extremely important to capital sentencing juries. See Commentary to ABA Guideline 4.1 (stating that "mental health experts are essential to defending capital cases."). The "[Supreme Court] [has] long [] referred [to these ABA standards] as 'guides to determining what is reasonable.'" Wiggins, 539 U.S. at 524.

In Frogge's case, the most persuasive mitigating evidence regarding his mental health was kept from the jury. The mandate of Strickland and the Constitution is not simply to investigate, but rather to provide "effective" assistance. Defense counsel's actions in light of the circumstances were "rudimentary" and certainly illogical and unreasonable. While I do not suggest that defense counsel must scour the earth "shopping" for the most preeminent experts, I do believe that justice requires, at a minimum, for counsel to secure an expert in the relevant field. This is particularly so, for a counsel who knows, as here, the specific testing required to support its mental health defense.

Without question, defense counsel's initial inquiry revealed that neurological testing was necessary. The anecdotal evidence of Frogge's post-brain injury behavior, Dr. Hoover's assessment, and the testimony of Dr. Kramer taken together illustrate that defense counsel could not have "reasonably

42

surmised" that neurological testing, in spite of Dr. Tyson's opinion, would have been fruitless. Indeed, it is neurological testing alone that revealed that Frogge suffers from permanent organic brain damage. Thus, defense counsel's decision not to conduct neurological testing or even present evidence of Frogge's brain injury was unreasonable in light of <u>Strickland</u> and prevailing professional norms.

### III.

Additionally, the record further underscores the State Supreme Court's unreasonable denial of relief. The State Supreme Court held that it was objectively reasonable for defense counsel to rely on Dr. Tyson's assessment because Dr. Tyson had Frogge's medical and social histories, and transcripts from Frogge I. (J.A. 2198.) How the State Supreme Court reaches this conclusion is befuddling. The MAR court specifically found that:

> Dr. Tyson did not perform or request any neurological or neuropsychological tests on [Frogge], and none were done. <u>His diagnosis was not supported by reliance on any such tests, review of medical records concerning the 1990 head injury or descriptions by family and friends</u> of changes in the defendant's behavior after that injury.

(J.A. 2135, emphasis added.) In light of the Anti-Terrorism Effective Death Penalty Act's mandate that a state court's

43

findings of fact are entitled to a "presumption of correctness," the State Supreme Court's factual error is a dispositive display of an "erroneous application of facts to the law." 28 U.S.C. § 2254(e)(1). First, Ferguson testified that he did not "recall" or "think" that he provided the medical records or social history reports to Dr. Tyson. (J.A. 1909). Second, in an affidavit provided to the MAR court, Dr. Tyson attested that he was not provided with, nor did he review, any medical records concerning Frogge's brain injury. (J.A. 1109.) Third, Freedman also submitted an affidavit attesting that he did not provide Dr. Tyson with Frogge's medical records, which detailed Frogge's brain injury. (J.A. 2028). Finally, the State Supreme Court did not find any error in the MAR court's clear factual findings.

According to the majority, the State Supreme Court's factual error is inconsequential because the court "merely observed" that Dr. Tyson reviewed the medical records. However, the majority, itself, recognizes that the State Supreme Court thrice stated this factual error.[1] Most tellingly, it was only

_____

[1]The State Supreme Court stated the following: "[D]efense counsel provided Dr. Tyson with their entire discovery file . . . and made available to him defendant's medical records;" "The material supplied to Dr. Tyson also included the testimony given at [the 1995 trial] by Drs. Hoover and Kramer, and attorney Freedman believed that Dr. Tyson testified in [the 1998 trial] that he had reviewed this testimony;" "By the time

44

in the context of this erroneous factual predicate - Dr. Tyson being given Frogge's medical and social histories - that the Court decided whether defense counsel's failure to pursue neurological testing was objectively reasonable and prejudicial to Frogge. (J.A. 2198.) The State Supreme Court's rationale demonstrates that the Court's holding was tethered to a significant factual error. The majority's observations to the contrary are incredulous.

Put simply, the State Supreme Court's assumption that Dr. Tyson offered an opinion informed by Frogge's medical records was clearly erroneous and reflects "an unreasonable determination of the facts in the light of the evidence presented in the State court proceeding." § 2254(d)(2). Moreover, the State Supreme Court's conclusion that the scope of defense counsel's investigation of Frogge's mental health meets the legal standards of Strickland is an objectively unreasonable application of Supreme Court precedent.

---

defense counsel were preparing for defendant's second trial, they had consulted two mental health experts, Drs. Hoover and Tyson, both of whom had full access to defendant, his family, and the pertinent medical records of defendant's head injury, and neither of whom recommended neurological testing. State v. Frogge, 607 S.E.2d 632, 635.

45

Unlike the majority, I am also certain that defense counsel's "ineffective assistance" prejudiced Frogge within the meaning of Strickland. Under Strickland, Frogge must show that "but for counsel's unprofessional errors, the [sentence] would have been different." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). In determining prejudice, we must "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 123 S.Ct. at 2542.

Because the State Supreme Court reversed the MAR Court on the Strickland performance prong, it did not assess Frogge's ineffective assistance claim for prejudice. The State, however, offered substantial evidence of aggravating circumstances. For example, the State emphasized that Audrey was bedridden and Frogge stabbed her over eleven times. Due to her condition, she was also forced to watch Frogge stab his father to death. Frogge also testified that Audrey had done nothing to provoke his rage.

Mental health evidence was the crux of Frogge's mitigation case. How else to explain why the same young man who thoughtfully came home to make his bed-ridden step-mother a grilled cheese sandwich and tomato soup would, mere hours later, beat her to death. Thus, it was paramount for defense counsel

46

to offer an explanation as to why Frogge went into an uncontrollable rage and murdered Audrey. Dr. Tyson testified that Frogge likely suffered from personality disorder and had limited functioning skills aggravated by substance abuse. Unlike Frogge I, no evidence of Frogge's brain injury - let alone organic brain damage - was presented to the jury, despite defense counsel's belief that the injury was significant. "Under North Carolina law, . . . the prejudice inquiry in this case distills to whether [Frogge] had shown that there is a reasonable probability that, but for counsel's deficient performance, at least one jury member would have found the mitigating circumstances outweigh the aggravating circumstances and recommended life imprisonment." Bowie v. Branker, 512 F.3d at 120.[2]

The answer to this inquiry is obvious. When presented with evidence of Frogge's brain injury at least one juror in Frogge I found that the crime was committed under the influence of mental or emotional disturbance, thereby depriving Frogge of the capacity to appreciate the criminality of his conduct - a

---

[2]Because the State Supreme Court did not reach Strickland's prejudice prong, we review the question of prejudice *de novo*. See Dugas v. Coplan, 428 F.3d 317, 327 (1st Cir. 2005) (citing Ellsworth v. Warden, 333 F.3d 1, 3-4 (1st Cir. 2003) (en banc) ("Appellate review of the district court's denial of habeas relief is *de novo*, but we accord deference to the state court as to issues it actually decided.")).

statutory mitigating factor under North Carolina law. The absence of such evidence from the guilt and penalty phase of Frogge's second trial undoubtedly prejudiced him. But for defense counsel's deficient performance, the jury would have known that Frogge suffers from permanent organic brain damage - a diagnosis the State does not rebut – which "under periods of extreme emotional distress would lead him to act impulsively and not appreciate the full consequences of his actions, impairing his judgment, reasoning and impulse control." (J.A. 1706-07.)

Given the powerful nature of this evidence, the outcome reached by the majority truly is alarming. Frogge's organic brain damage coupled with the other mitigation evidences "might well have influenced" at least one juror's 'appraisal' of his 'culpability,'" as it did the experienced MAR judge - a rarity. Rompilla, 545 U.S. at 393 (citing Wiggins, 539 U.S. at 538). Quite clearly, defense counsel's failure to even present evidence of Frogge's brain injury and obtain neurological testing is ineffective assistance of counsel under Strickland.