IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-1135

Filed: 31 December 2020

Rowan County, No. 16 CRS 56161

STATE OF NORTH CAROLINA

v.

JERMAIL BLAKE

Appeal by defendant from judgment entered 24 May 2019 by Judge Anna M. Wagoner and order entered 30 August 2019 by Judge Richard S. Gottlieb in Superior Court, Rowan County. Heard in the Court of Appeals 6 October 2020.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Alexander G. Walton, for the State.*
>
> *Sarah Holladay, for defendant.*

STROUD, Judge.

Defendant appeals from his conviction for voluntary manslaughter. Defendant argues there was prejudicial error in three phases of his trial: (1) structural error based upon the jury's disregard of the trial court's instructions; (2) denial of his right to be present for all stages of his trial as he was not present for post-trial motions; and (3) error in the Order denying his Motion for Appropriate Relief, by imposing a bar on future post-conviction litigation. We conclude there was structural error where a number of jurors told the presiding judge immediately after indicating their verdict was unanimous, but before judgment was entered, that they were not "sure

that the defendant committed this crime but, . . . 'Someone -- that man died, so someone needs to go to prison[.]'" Accordingly, Defendant is entitled to a new trial. We also vacate the Order denying Defendant's Motion for Appropriate Relief.

I.     Factual and Procedural Background

The offense charged arose from a party on the night of 30 December 2016 at Anthony Angle's house. Three witnesses testified for the State about the events of 30 December 2016. Their accounts to the exact details were not entirely consistent and in some instances contrary to the physical evidence, but all indicated that Defendant and Altereck Shields got into a physical altercation that resulted in Mr. Shield's death.

Mr. Angle testified that Mr. Shields arrived at the party around 11:30 AM. Approximately an hour later Defendant, who is Mr. Angle's cousin, and one of Defendant's friends arrived at the party. Mr. Angle sold Defendant a gram of cocaine, and Defendant consumed half that amount. Defendant and Mr. Shields got into an argument in the kitchen "about who the -- who were the best Bloods, East Coast or West Coast, at the time." Mr. Angle stepped out of the kitchen for a minute, and when he returned, Defendant and Mr. Shields were in a scuffle and "barrel hooked up." Mr. Angle and other people at the party tried to break Defendant and Mr. Shields up but they were unsuccessful and decided to "push 'em out the door so they don't bust holes in the wall." After the two men were outside, Mr. Angle observed

Defendant and Mr. Shields fall over a small wall and continue fighting. Then Mr. Shields straddled Defendant while he was still on the ground and hit him several times with his fists. Mr. Angle saw Defendant produce a knife and stab Mr. Shields with one of his kitchen knives. Then one of the party guests said, "You done killed my cousin," and started beating Defendant; others then joined in. Mr. Angle tried to stop the crowd but could not and called 911. Mr. Shields ultimately died because of his injuries.

Defendant was indicted on one count of second degree murder and tried at the 20 May 2019 criminal session of Superior Court, Rowan County, with the Honorable Anna M. Wagoner presiding. The State presented testimony from eight witnesses; Defendant presented evidence consisting of photographs, documents, and recordings, but no witnesses testified for Defendant. The jury deliberations begin at 11:46 AM on 21 May 2019. At 12:23 PM the trial judge indicated she had received a note from the jury:

> THE COURT: All right. I just have a note from the jury with some questions which I will read out loud. The first one is: May we have pictures of the back of the house; Number 2: Pictures of kitchen and dining room; and, Number 3: Is there a record of 911 call by Mr. Andrade or Andrade or whatever the [sic] call him? And if yes, can we have?

After discussing with counsel, the trial court agreed to show the jury the requested pictures, but there was no record of the 911 call to present to the jury. The court went

on recess for lunch until 1:46 PM.  When the jury returned to the courtroom, they were allowed to look at the pictures and asked an additional question about the ages of the Defendant and the deceased.

The jury returned to the jury room at 1:53 PM.  At 4:09 PM the jury returned a unanimous verdict finding Defendant guilty of voluntary manslaughter.  The trial court polled the jury, and all jurors individually indicated this was still their verdict.  But after polling the jury, the trial court held an unrecorded bench conference with counsel and after coming back on the record said, "I just want to be sure because a few of the jurors were a little hesitant, unsure, if that was truly your verdict."  The trial court questioned one juror individually, and she confirmed her agreement with the verdict.  The trial court then thanked the jury for its service and asked the jury to step into the jury room.  Between 4:19 PM and 4:28 PM, the trial court met with the jury and then met with counsel in an unrecorded conference in chambers.  Immediately after the conference in chambers, Defendant's counsel made a motion to set aside the verdict "*based on what Your Honor's heard.*"  (Emphasis added.)  The motion was denied.  The trial court had another unreported conference with counsel in chambers at 4:29 PM, and the proceedings resumed at 4:34 PM.  The trial court then announced that the parties were discussing sentencing and decided to do the sentencing tomorrow morning "in order to give the defense an opportunity to decide what they may want to present in mitigation and anything else."

The next day, Defendant and the State appeared in court, and Defendant's counsel explained his client consented to hearing a matter in chambers:

> Your Honor, I do have one matter for Your Honor to consider on the record; however, we're agreeable to do this -- my client is giving his consent to do this in chambers if Your Honor would prefer. That's actually our request.

The parties then proceeded to sentencing, and Defendant's counsel presented mitigating factors. Defendant was sentenced in the mitigated range, and he gave oral notice of appeal. Proceedings then continued on the record in the judge's chambers with the trial judge, Defendant's counsel, two assistant district attorneys, and the court reporter:

> THE COURT: All right. We are having this hearing in chambers with the consent of the defendant because of the court's concern about the incredibly bad blood between these parties and the court would prefer that no one else be injured. Okay. Yes, sir, I think you had a --
>
> MR. SEASE: Would specifically ask -- the defense would specifically ask for permission from Your Honor to renew and further enumerate on a motion to set aside the verdict at the close of all the evidence and the verdict has already been announced.
>
> THE COURT: All right. You may renew it.
>
> MR. SEASE: Thank you.
>
> THE COURT: You're welcome.
>
> MR. SEASE: At this juncture what we would consider is, although the deliberations of the jury are sacrosanct in nature, they can be delved into in a limited

fashion if certain things apply and they're very, very limited. What I would propose to Your Honor in the way that this case played out is that during closing arguments, by no fault of the State whatsoever, a picture of the body of the victim was posted which led to the subsequent and understandable symp – strike that –

THE COURT: Upset.

MR. SEASE: -- sobbing and crying, and, again, understandable, why wouldn't they feel that way, but from the victim's family. It was what felt to the defense like eternity, it wasn't actually that long, but it continued on. The State stopped to try to further escort these people out so that it wouldn't distract anyone from the closing. We would contend that the jury, of course, heard it, and that based on the verdict and based on what the defense would feel – the defense would feel that that would be a realistic thing they would consider. It's an extraneous, prejudicial thing to consider for the jury, one that cannot be met by cross-examination by the defendant. It wasn't in evidence. It wasn't law. It wasn't anything but an extraneous consideration that's outside the purview of what they're allowed to consider. Further, it has come to our attention that juror No. 9 may be first cousin –

THE COURT: Who at one time was an alternate; correct?

MR. SEASE: Who at one time was an alternate and by the fact that the original juror No. 9 had a family emergency and did not come to court was placed into seat No. 9. And it has come to our attention that she may or may not but we believe that she may be first cousins with Denerio Robinson, Duck, one of the witnesses for the State. We have been able to corroborate that she lives beside of Robinsons, but to be fair it's not Denerio Robinson; it's Demeria, D-e-m-e-r-i-a, Robinson. We also have reason to believe that Denerio Robinson's dad's last name is Allen.

- 6 -

. . . .

> Just based on what -- the information that I've received about the case, we'd ask Your Honor to set that verdict aside[.]

The trial court denied Defendant's motions and informed counsel for both parties:

> All right. Now, the court is going to put on the record as well that, after the jury announced its verdict and they were discharged, I spoke to them like I always speak to the jurors -- jury after the case was over. *And several of them, say the majority, indicated to me that they did not believe any of the witnesses, that in their opinion the witnesses -- and I'm saying their because I don't know which -- I would say at least seven -- the witnesses were not believable, that they weren't sure that the defendant committed this crime but, quote, this is what I was told three or four times, "Someone -- that man died, so someone needs to go to prison,"* which I disclosed to the attorneys yesterday and I'm disclosing to them again today outside of the presence of the public and outside the presence of the defendant with his consent. I think that's it.

(Emphasis added.) After additional discussion with counsel on the record, the trial court stated, "And I think anything else that happened will be subject for motion for appropriate relief. We'll cross that bridge when we come to it." On 3 June 2019, Defendant filed a Motion for Appropriate Relief ("MAR"). The MAR was heard by the Honorable Richard S. Gottlieb. On 28 August 2019, Judge Gottlieb entered an order denying Defendant's MAR, and Defendant timely appealed.

## II. Structural Error

Defendant argues, "structural error occurred where judgment was entered despite the jury informing the trial court that they were not convinced of [Defendant's] guilt, but felt that someone had to be punished for the victim's death." (Original in all caps.) "Structural error is a rare form of constitutional error resulting from 'structural defects in the constitution of the trial mechanism' which are so serious that 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.'" *State v. Garcia*, 358 N.C. 382, 409, 597 S.E.2d 724, 744 (2004) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 1264-65, 113 L.Ed.2d 302, 331 (1991)).

> The United States Supreme Court has identified only six instances of structural error to date: (1) complete deprivation of right to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); (2) a biased trial judge, *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); (3) the unlawful exclusion of grand jurors of the defendant's race, *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); (4) denial of the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984); (5) denial of the right to a public trial, *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); and (6) constitutionally deficient jury instructions on reasonable doubt, *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

*State v. Polke*, 361 N.C. 65, 73, 638 S.E.2d 189, 194 (2006). "In each of the six United States Supreme Court cases rectifying structural error, the defendant made a preliminary showing of a violated constitutional right and the identified

constitutional violation *necessarily* rendered the criminal trial fundamentally unfair or unreliable as a vehicle for determining guilt or innocence." *State v. Garcia*, 358 N.C. at 410, 597 S.E.2d at 745.

A.     Standard of Review

As a form of constitutional error, we review structural error *de novo. State v. Veney*, 259 N.C. App. 915, 917, 817 S.E.2d 114, 116 (2018). Structural error is reversible *per se. State v. Garcia*, 358 N.C. at 409, 597 S.E.2d at 744. The trial court instructed the jury on second degree murder, voluntary manslaughter, or not guilty, and the jury unanimously found Defendant guilty of voluntary manslaughter. After the verdict was announced, Defendant's counsel moved to poll each individual juror. The clerk asked each individual juror if the verdict was still their verdict, and they all answered, "Yes." The trial court told the jury "this will conclude your service as jurors." The jury returned to the jury room at 4:19 PM, and the trial transcript states there was an "Unreported conference in chambers" and "Proceedings resume at 4:28 PM." Defendant's counsel asked the trial court to set aside the verdict, "Your Honor, just the defense would make a motion to set aside the verdict at this time *just based on what Your Honor's heard.* I don't wish to belabor the point. Thank you." (Emphasis added.) The next day, the trial court stated on the record what the jury told her between 4:19 and 4:28 PM:

> All right. Now, the court is going to put on the record as
> well that, after the jury announced its verdict and they

> were discharged, I spoke to them like I always speak to the jurors -- jury after the case was over. And several of them, say the majority, indicated to me that they did not believe any of the witnesses, that in their opinion the witnesses -- and I'm saying their because I don't know which -- I would say at least seven -- the witnesses were not believable, that they weren't sure that the defendant committed this crime but, quote, this is what I was told three or four times, "Someone -- that man died, so someone needs to go to prison," which I disclosed to the attorneys yesterday and I'm disclosing to them again today outside of the presence of the public and outside the presence of the defendant with his consent. I think that's it.

The State argues plain error is the proper standard of review because it contends the specific grounds for Defendant's initial motion to set aside the verdict were "not apparent from the context" where this was discussed in chambers and off the record. But plain error review is applicable only to evidentiary errors and jury instructions, not the argument raised by Defendant. *See State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012) ("[P]lain error review in North Carolina is normally limited to instructional and evidentiary error." (citing *State v. Wiley*, 355 N.C. 592, 615, 565 S.E.2d 22, 39-40 (2002))). And as soon as Defendant's counsel became aware of this issue, Defendant did preserve it for full review. As noted above, Defendant's counsel identified the reasons for his motion to set aside the verdict more than once; the reasons included "what your Honor's heard," which in context refers to the judge's discussion in the jury room with the jurors, as well as the reaction of the victim's family to the photograph of the victim and the juror who may have been

related to one of the State's witnesses.  On appeal, Defendant's argument as to structural error is based only upon the jurors' comments, and we conclude this argument was fully preserved for appellate review as Defendant made a timely motion at trial and identified the grounds for this argument.  N.C. R. App. P. 10(a)(1).

B.      Jury's Disregard of Instructions on Reasonable Doubt

Defendant argues,

> Given the jury's determination that the State had not proven [Defendant's] guilt beyond a reasonable doubt, the only proper course of action was to set aside the verdict. Polling the jury to determine whether they agreed with the verdict could not cure the fundamental defect that the verdict itself did not include a finding that [Defendant] was guilty beyond a reasonable doubt.

We agree.

Here, the jury was instructed,

> The State must prove to you that the defendant is guilty beyond a reasonable doubt.
> A reasonable doubt is a doubt based on reason and common sense arising out of some or all of the evidence that has been presented or the lack or insufficiency of the evidence as the case may be.  Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

We conclude the jury was properly instructed on reasonable doubt.

Yet the jurors—"the majority" of them—told the trial court they had disregarded the instruction regarding finding guilt "beyond a reasonable doubt:"

several of them, say the majority, indicated to me that they did not believe any of the witnesses, that in their opinion the witnesses -- and I'm saying their because I don't know which -- I would say at least seven -- the witnesses were not believable, that *they weren't sure that the defendant committed this crime but, quote, this is what I was told three or four times, "Someone -- that man died, so someone needs to go to prison[.]"*

(Emphasis added.) We conclude the jury disregarded its instruction by the trial court and convicted Defendant on a standard less than beyond a reasonable doubt. The majority of the jurors told the trial court they did not believe "at least seven" of the State's eight witnesses and convicted Defendant because "someone needs to go to prison." The jurors' comments to the trial court demonstrated that the trial did not accomplish its central purpose: "the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence." *State v. Lawrence*, 365 N.C. 506, 512, 723 S.E.2d 326, 330 (2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986)). We conclude this defect in Defendant's trial resulted in the trial no longer "serv[ing] its function as a vehicle for determination of guilt or innocence." *State v. Garcia*, 358 at 409, 597 S.E.2d at 744.

The State argues that "there is a strong presumption against finding structural error and the doctrine only applies to a limited number of cases. Defendant's claim does not fit into any of specific types of cases outlined by the Courts." *See State v. Anderson,* 355 N.C. 136, 142, 558 S.E.2d 87, 92 (2002) ("Additionally, the Supreme Court has found structural error to exist in very few cases."). The State is correct

that the types of cases where structural error has been found are limited, but the

circumstances here present the same type of constitutional error present in some of

those cases.  In *Sullivan v. Louisiana,* the United States Supreme Court addressed

the right to a verdict based upon the jury's determination of guilt beyond a reasonable

doubt:

> What the factfinder must determine to return a verdict of guilty is prescribed by the Due Process Clause. The prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder "beyond a reasonable doubt" of the facts necessary to establish each of those elements[.]  This beyond-a-reasonable-doubt requirement, which was adhered to by virtually all common-law jurisdictions, applies in state as well as federal proceedings.
>
> It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated.  It would not satisfy the Sixth Amendment to have a jury determine that the defendant is *probably* guilty, and then leave it up to the judge to determine (as *Winship* requires) whether he is guilty beyond a reasonable doubt.  In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt.

508 U.S. 275, 277-78, 113 S. Ct. 2078, 2080-81, 124 L. Ed. 2d 182, 188 (1993).

Defendant both preserved this error at trial and has demonstrated prejudice,

although in this instance, the burden to demonstrate prejudice was not on Defendant.

The burden is on the State to demonstrate that a constitutional error is harmless

beyond a reasonable doubt.  *See* N.C. Gen. Stat. § 15A-1443(b) (2019) ("A violation of

the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.").

> When violations of a defendant's rights under the United States Constitution are alleged, harmless error review functions the same way in both federal and state courts: "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." In other words, an error under the United States Constitution will be held harmless if "the jury verdict would have been the same absent the error." Under both the federal and state harmless error standards, the government bears the burden of showing that no prejudice resulted from the challenged federal constitutional error. But if the error relates to a right not arising under the United States Constitution, North Carolina harmless error review requires the defendant to bear the burden of showing prejudice. In such cases the defendant must show "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."

*State v. Lawrence*, 365 N.C. at 513, 723 S.E.2d at 331 (alteration in original) (citations omitted).

The State has not demonstrated this error was harmless beyond a reasonable doubt. Instead, the State argues this error is not one of the errors previously identified as structural error and asserts that the "[r]ecord clearly reflects, there was no juror misconduct" based upon the polling of the jurors.

C.     Rule 606 of the North Carolina Rules of Evidence

The State argues, "the 'evidence' Defendant points to in an attempt to impeach

the verdict came in the form of the trial court's resuscitation of events following

Defendant's conviction."  Rule 606 of the North Carolina Rules of Evidence states:

> (b) Inquiry into validity of verdict or indictment.--Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

N.C. Gen. Stat. § 8C-1, Rule 606.

> The proscription against impeachment of a jury verdict "is well settled in North Carolina."  "[A]fter a verdict has been rendered and received by the court, and jurors have been discharged, jurors will not be allowed to attack or overthrow their verdict, nor will evidence from them be received for such purpose."
> The purpose of the "no-impeachment rule" is "to promote freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment."  This rule has been codified under N.C. Gen. Stat. § 8C-1, Rule 606(b), and N.C. Gen. Stat. § 15A-1240(a).  As our Supreme Court has observed, "Rule 606(b) reflects the common law rule that affidavits of jurors are inadmissible for the purposes of impeaching the verdict

except as they pertain to extraneous influences that may
have affected the jury's decision."

*State v. Corbett*, ___ N.C. App. ___, ___, 839 S.E.2d 361, 377, *writ allowed*, 373 N.C. 580, 838 S.E.2d 461 (2020); *State v. Lyles*, 94 N.C. App. 240, 246, 380 S.E.2d 390, 394 (1989) ("Finally, although Rule 606(b) is broader in some respects than Section 15A–1240, we do not agree with any suggestion that the two statutes conflict. In our view, the exceptions to the anti-impeachment rule listed in Section 15A–1240 are designed to protect the same interests as, and are entirely consistent with, the exceptions in Rule 606(b).").

In *State v. Coleman*, 161 N.C. App. 224, 587 S.E.2d 889 (2003), this Court addressed an instance of a claim that a juror had disregarded instructions during the trial. In *Coleman*, during the second day of jury deliberation, the trial court received "a note from the jury alleging that one juror was 'not following the law.'" *Id.* at 228, 587 S.E.2d at 892-93 (2003). "In response to the note, the trial court informed the jury that a juror could not be replaced and instructed the jury as to its duty to follow the law." *Id.* at 228, 587 S.E.2d at 893. The defendant did not request any additional instructions or make any motions in response to the note. *Id.* at 229, 587 S.E.2d at 893. The jury ultimately delivered a unanimous verdict. *Id.* at 228, 587 S.E.2d at 892. Reviewing the defendant's argument on appeal under Rule 2, this Court noted, "To warrant an investigation, 'the circumstances must be such as not merely to put suspicion on the verdict, because there was an opportunity and a chance for

misconduct, but that there was in fact misconduct. When there is merely matter of suspicion' it is a decision left to the trial court's discretion." *State v. Coleman*, 161 N.C. App. 224, 229, 587 S.E.2d 889, 893 (2003) (quoting *State v. Aldridge*, 139 N.C. App. 706, 713, 534 S.E.2d 629, 634 (2000)). This Court concluded,

> In the case before us, it was within the discretion of the trial court to determine whether an inquiry was necessitated by the note from the jury. Based on the ambiguity of the note's allegation and the corrective measure taken by the trial court in its subsequent instruction, there was no obligation to investigate further.

*Id.* at 229, 587 S.E.2d at 893.

Here, the jury's misconduct did not involve just one juror but a "majority." The misconduct was not "merely a matter of suspicion;" the misconduct was confirmed by the trial court. In addition, the misconduct goes to the very heart of the defendant's right to a presumption of innocence and the requirement that he be convicted only upon proof "beyond a reasonable doubt." *Sullivan v. Louisiana*, 508 U.S. at 277-78, 113 S. Ct. at 2080-81, 124 L. Ed. 2d at 188. In addition, the circumstances of this case do not involve an "inquiry into the validity of the verdict" raised after the trial by the Defendant. *See* N.C. Gen. Stat. § 8C-1, Rule 606(b) ("Upon an inquiry into the validity of a verdict or indictment . . . ."). The transcript reflected the trial judge's immediate concern regarding the verdict, both by the additional inquiry in open court and her discussion with the jurors after the verdict. The trial court included the

details of the jurors' comments in the record. There were no affidavits from jurors or attempts by the defendant to obtain any information from jurors after the trial.

We have been unable to find a comparable situation in our caselaw, but *State v. Coleman*, 161 N.C. App. 224, 228, 587 S.E.2d 889, is instructive. We conclude this misconduct by the jurors did more than "merely . . . put suspicion on the verdict," and therefore it was not left to the trial court's discretion to remedy the injustice. *See id.* at 229, 587 S.E.2d at 893. Further, we conclude based on the facts of this case that it is not the type of situation Rule 606 was designed to protect against, and Rule 606 does not preclude the juror's misconduct from being structural error. *See State v. Corbett*, ___ N.C. App. ___, ___, 839 S.E.2d 361, 377 (2020). ("The purpose of the 'no-impeachment rule' is 'to promote freedom of deliberation, stability and finality of verdicts, and protection of jurors against annoyance and embarrassment.'" (quoting *Cummings v. Ortega*, 365 N.C. 262, 267, 716 S.E.2d 235, 239 (2011))).

Based upon this structural error, where the jurors failed to follow the trial court's instructions to find Defendant guilty beyond a reasonable doubt, the appropriate remedy for Defendant is a new trial. *State v. Garcia*, 358 at 409, 597 S.E.2d at 744 ("'Such errors "infect the entire trial process," and "necessarily render a trial fundamentally unfair[.]"' For this reason, a defendant's remedy for structural error is not depend[e]nt upon harmless error analysis; rather, such errors are

reversible per se." (citations omitted)). The trial court erred by not granting Defendant's motion to set aside the verdict, and Defendant is entitled to a new trial.

### III. Motion for Appropriate Relief

Because we are granting Defendant a new trial, we will not address Defendant's argument regarding not being present for all stages of the trial. However, Defendant has also appealed from the trial court's Order denying his MAR. As the trial judge noted after the final denial of Defendant's motions, "anything else that happened will be subject for motion for appropriate relief. We'll cross that bridge when we come to it."

On 3 June 2019, Defendant filed an MAR. Defendant filed the MAR within 10 days of the judgment in accord with North Carolina General Statute §15A-1414 (2019). In the MAR, Defendant raised essentially the same arguments as in he did on appeal as well as additional arguments not addressed on appeal regarding the issues noted in his arguments to the trial court as quoted above. Judge Gottlieb denied the MAR without an evidentiary hearing on 28 August 2019. The Order includes a decree that "[p]ursuant to N.C.G.S. § 15A-1419, Defendant's failure to asset any other grounds in [the MAR] shall be subject to being treated in the future as a BAR to any other claims, assertions, petitions or motions that he might hereafter file in this case."

### A. Standard of Review

"When considering rulings on motions for appropriate relief, we review the trial court's order to determine 'whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court.'" *State v. Frogge*, 359 N.C. 228, 240, 607 S.E.2d 627, 634 (2005) (quoting *State v. Stevens*, 305 N.C. 712, 720, 291 S.E.2d 585, 591 (1982)). "However, the trial court's conclusions are fully reviewable on appeal." *State v. Wilkins*, 131 N.C. App. 220, 223, 506 S.E.2d 274, 276 (1998) (citing *State v. Stevens*, 305 N.C. at 720, 291 S.E.2d at 591).

Although we must vacate the Order denying Defendant's MAR based upon our determination that he is entitled to a new trial, we will address briefly his argument regarding the Order because it is based not just on the substantive issues already addressed but also upon the decree purporting to bar defendant from filing future MARs. North Carolina General Statute § 15A-1414 provides "After the verdict but not more than 10 days after entry of judgment, the defendant by motion may seek appropriate relief for any error committed during or prior to the trial." N.C. Gen. Stat. § 15A-1414(a) (2019). The statute further provides,

> (b) Unless included in G.S. 15A-1415, all errors, including but not limited to the following, must be asserted within 10 days after entry of judgment:
> . . . .
> > (2) The verdict is contrary to the weight of the evidence.
> > (3) For any other cause the defendant did not receive a fair and impartial trial.

N.C. Gen. S. § 15A-1414(b)(2)-(3) (2019). North Carolina General Statute § 15A-1415

limits noncapital defendants to ten grounds on "which the defendant may assert by a

motion for appropriate relief made more than 10 days after entry of judgment[.]" N.C.

Gen. Stat. § 15A-1415 (2019). North Carolina General Statute § 15A-1419 provides

grounds for *denying* a MAR, including,

> (a) The following are grounds for the denial of a motion for appropriate relief, including motions filed in capital cases:
> (1) *Upon a previous motion* made pursuant to this Article, the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so. This subdivision does not apply when the previous motion was made within 10 days after entry of judgment or the previous motion was made during the pendency of the direct appeal.
> (2) *The ground or issue underlying the motion was previously determined on the merits* upon an appeal from the judgment or upon a previous motion or proceeding in the courts of this State or a federal court, unless since the time of such previous determination there has been a retroactively effective change in the law controlling such issue.
> (3) *Upon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so.*

N.C. Gen. Stat. § 15A-1419(a)(1) (2019) (emphases added). In addition, denial is not

proper if a defendant can show: "(1) Good cause for excusing the grounds for denial

listed in subsection (a) of this section and can demonstrate actual prejudice resulting

from the defendant's claim; or (2) That failure to consider the defendant's claim will

result in a fundamental miscarriage of justice." N.C. Gen. Stat § 15A-1419(b)(1)-(2) (2019).

The State does not identify any legal basis for the trial court's order barring Defendant from filing *future* MARs but argues, "Defendant's challenge to the Order denying is Motion for Appropriate Relief is premature and not ripe for review because there have not been any post-conviction claims, assertions, petitions, or motions and the Order has no effect on this appeal." However, the State cites to no authority in support of its position, and we conclude the trial court did not have authority under North Carolina General Statutes §§ 15A-1414-15,19 to direct that Defendant would be barred from *filing* "any other claims, assertions, petitions or motions that he might hereafter file in this case."

It is a correct statement of law that a defendant's future MAR may be denied if he attempts to raise an issue in a MAR which has previously been determined if he was in the position to raise it in a prior motion or appeal. *See* N.C. Gen. Stat. § 15A-1419(a). But North Carolina General Statutes. § 15A-1419(a) does not give a trial court authority to enter a gatekeeper order declaring in advance that a defendant may not, in the future, file an MAR; the determination regarding the merits of any future MAR must be decided based upon that motion. *See* N.C. Gen. Stat. § 15A-1420(c) (2019). Gatekeeper orders are normally entered only where a defendant has previously asserted numerous frivolous claims. *See generally Fatta v. M & M*

*Properties Mgmt., Inc.*, 224 N.C. App. 18, 31, 735 S.E.2d 836, 845 (2012) ("The gatekeeper provision limited plaintiff from filing or submitting to the Iredell County Superior Court any further motion, pleading, or other document unless the document was signed by a North Carolina licensed attorney."). Defendant had filed only one MAR and this motion was filed within ten days after the trial. This is not a case where a defendant has filed many frivolous MARs asserting the same claims. Based upon our determination that Defendant must receive a new trial, the Order denying Defendant's MAR is vacated.

IV. Conclusion

Based on the particular circumstances of this case, there was structural error where multiple jurors indicated to the trial court before judgment was entered that "they weren't sure that the defendant committed this crime." The judgment and the Order denying Defendant's MAR are vacated, and this matter is remanded for a new trial.

NEW TRIAL.

Chief Judge McGEE and Judge ARROWOOD concur.